Filed 12/12/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S100735 |
| v. | ) | |
| | ) | |
| DANIEL GARY LANDRY, | ) | |
| | ) | San Bernardino County |
| Defendant and Appellant. | ) | Super. Ct. No. FCH-02773 |
| _____ | ) | |

Defendant Daniel Gary Landry was convicted by a jury of first degree murder (Pen. Code,[1] § 187, subd. (a)), two counts of assault by a life prisoner with malice aforethought (§ 4500), and one count of custodial possession of a weapon (§ 4502, subd. (a)). Additionally, the jury found true allegations that defendant personally used a deadly and dangerous weapon in the commission of the offenses (former § 12022, subd. (b)(1)), and that he had suffered two prior strike convictions for first degree residential burglary (§ 459). (§ 1170.12, subds. (a)-(d).) Following a penalty trial, the jury returned a verdict of death. The trial court denied the automatic application to modify the verdict (§ 190.4, subd. (e)), and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) For the reasons set forth below, we strike the one-year enhancement imposed on count

---

[1] All unspecified statutory references are to the Penal Code.

3 (assault by a life prisoner) for personal use of a deadly weapon, and otherwise affirm the judgment.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution Case

##### a. Fatal Attack on Daniel Addis (Counts 1 and 2)

In August 1997, defendant and the homicide victim, Daniel Addis, were inmates at the California Institution for Men in Chino and housed in the administrative segregation unit (ASU). That housing unit is reserved for inmates who present safety or management concerns, including inmates awaiting adjudication for violations of prison rules. Defendant, who was serving a sentence of 25 years to life under the "Three Strikes law", was a member of a White supremacist gang called the Nazi Lowriders (NLR), as was his cellmate Gary Green. Defendant and Green were housed on tier 3 of ASU.

Addis, who was not a gang member, had been placed in ASU for assaulting a staff member. He had previously been housed on tier 3, but in July, he had asked to be moved to another tier. He told the guard to whom he made the request that he had stolen tobacco from NLR gang members. Commission of this offense by one who was not a member of the gang would have resulted in retaliation from the gang. Addis was moved off tier 3 and eventually housed in a single cell on tier 1 of ASU.

Although Addis was housed on a tier different from defendant and other NLR members, he exercised in the same yard, one of four that were segregated by race and gang affiliation. The procedure for moving inmates from their cells to the exercise yards involved stringent security protocols. The yard was searched for weapons before any inmate was allowed to enter. In addition, the inmates

2

were subjected to repeated searches before they were allowed into the yard. These included a visual strip search in their cells, passing through a metal detector, a hand search of their person and effects and a final search by a hand-held metal detector before they were admitted to the yard one at a time. As part of the strip search, they were required to squat and cough to determine if they were trying to smuggle contraband in their rectums. Once allowed into the yard, inmates were required to line up against the fence until all inmates were in the yard. Correctional officers in the guard tower could observe all four exercise yards.

On Sunday, August 3, 1997, all of the White inmates, except Addis, had entered their exercise yard. Defendant's cellmate, Gary Green, who was a "shot caller" and leader of the NLR gang, started yelling at the gate guard, Rosamaria Maldonado, to let Addis out into the yard. Inmates were subject to monthly classification reviews to determine, among other matters, whether they were eligible for the yard. If they were eligible, each decided whether to avail himself of the yard privilege. Addis was eligible to go into the yard and had done so the previous Thursday without incident.

Maldonado went to her superior, Sergeant Arioma Sams, and told him the other inmates were demanding that Addis be brought out into the yard. Sams testified that he checked the yard for unusual activity but did not observe any. Timothy Ginn, another guard on duty that day, testified he told Sams that if Addis went out into the yard he might get "beat up." Sams replied that their hands were tied because Addis had a right to go into the yard if he wanted to. Ginn told Addis "you don't have to go if you don't want to." Addis replied, "Fuck that. I want to go." Laramie McAlmond, another guard, testified that she overheard Ginn's conversation with Addis and confirmed that Addis said he wanted to go out to the yard. She testified that Addis said, "Everything's squashed," which is prison slang for everything is settled and there are no problems.

Addis was released into the yard at 9:30 or 9:45 a.m., about 30 to 45 minutes after defendant and Green had entered the yard. Officer Frank Esqueda, one of the two tower guards on duty, testified that Addis joined the other inmates in exercises, and then walked around and talked to a few inmates. Esqueda observed Green and defendant walking back and forth and talking, but despite the fact that Green had demanded that Addis be brought out, Green initially ignored Addis. Green acknowledged Addis at 11:15 a.m., when the showers typically were turned on. Green and Addis were standing by the showers, and Green shook his hand and told him, "It's all right, Danny. Go ahead and play cards." Addis then walked to a card table and sat down to play pinochle with other inmates. About 10 or 15 minutes later, Green and defendant walked from the showers to the table, talking back and forth. When they arrived at the table, defendant stood to the left of Addis, and Green stood to the left of defendant. One or two minutes later, Esqueda saw defendant make a sudden movement with his left hand to Addis's neck.

Another inmate, Ricky Rogers, who was playing at the same table, also observed defendant approach and stand behind Addis. Rogers testified that defendant and Addis had a friendly conversation about a third inmate. Rogers saw defendant raise his arm "real fast," and then heard a sound like a punch. Addis stood up from the table and put his hand to his neck. When he pulled his hand away, blood was streaming from his neck. He dropped to his knees and then fell over.

From the tower, Officer Esqueda also saw Addis reach for his neck and saw blood flowing from it. Esqueda ordered the inmates in the yard to get down on the ground. Everyone complied except defendant and Green, who continued running across the yard. Defendant and Green complied only after Esqueda fired a "gas launcher" that shot a wooden baton block into the yard. When defendant went on

4

the ground, a weapon popped out of his left hand and landed in front of him. At trial, the weapon was described as a stabbing instrument consisting of a sharpened piece of metal covered by a sheath made from cellophane and cardboard and wrapped with string.

Addis was removed from the yard bleeding profusely, and died en route to the hospital. An autopsy established the cause of death was massive blood loss caused by the severance of his jugular and subclavian veins. A great deal of force was required to inflict the fatal wound.

After Addis was removed from the yard, correctional officers cleared it of the inmates one at a time. The inmates remained prone until they were removed. Defendant's left hand and the stabbing instrument found near his hand were bloody. Defendant was giggling and laughing as he lay on the ground. Later he was examined and photographed. He had blood on his left hand and boxer shorts, but was uninjured. The stabbing instrument recovered near defendant was consistent with a weapon that would inflict the fatal wound Addis received.

Ten days after defendant attacked Addis, he threatened to flood the tier where he was housed unless he was moved. The officer to whom he made the statement told him he could not be moved because of the ongoing investigation into Addis's killing. Defendant replied, "I killed him so I confess. The investigation is over."

Defendant wrote two letters, one dated September 9, 1997, and the other September 22, 1997, to Joseph Lowery, another NLR member imprisoned at Corcoran State Prison. Glen Willett, a prison gang expert testified that defendant's use of certain phrases identified him as an NLR gang member and that other references were to the Addis homicide. The letters are described more fully below in connection with defendant's challenge to the letters' admission into evidence. (See *post*, pp. 34-40.)

5

### b. Attack on Joseph Matthews (Count 3)

On September 18, 1997, Officers Lourenco and Perez were escorting inmate Joseph Matthews from the showers to his cell when defendant called out from his cell, "Joe, want a cigarette." Matthews broke away from the officers and ran toward defendant's cell. Matthews, whose hands were cuffed behind his back, turned his back toward defendant's cell door and put his hands at the porthole opening of the door, reaching for something. Neither officer saw any object being transferred. A moment later, Matthews stepped away and said, "I'm cut." Matthews's back was bleeding from a deep gash 7 to 8 inches long and three-quarters of an inch wide. Within seconds after Matthews stepped away from the cell door, the officers heard the sound of defendant flushing the toilet. It was impossible to retrieve items flushed down the toilet, but Jeffrey Killian, a medical technician on the floor, testified that Matthews's wound was inflicted with a razor. Fourteen stitches were required to close Matthews's wound. Three weeks after the attack, Matthews told an investigator that defendant had pulled out a razor blade attached to a toothbrush which he used to attack Matthews, and then flushed the razor down the toilet.

### c. Custodial Possession of a Weapon (Count 4)

On October 15, 1997, officers entered defendant's cell, of which he was the sole occupant, to allow him out of the tier to exercise. When Officer Lopez opened defendant's cell door, a sharp metal object fell to the floor. Defendant smiled and shrugged. The object was a one-inch long piece of metal, shaped like a dagger and known in prison as a "spearhead." In a subsequent search of the cell, officers also recovered a razor blade that had been removed from the disposable razors given to inmates for shaving.

6

## 2. Defense Case

The defense conceded defendant's guilt on counts 3 and 4, the attack on Matthews and the possession of a weapon, and focused its efforts on counts 1 and 2, the killing of Addis. With respect to the attack on Addis, the defense argued that defendant acted out of duress because he himself would have been killed if he had not attacked Addis as ordered by Green and the NLR. As a corollary, he maintained that the prison guards knew Addis was going to be attacked and allowed it to happen in retaliation for Addis's assault on a prison guard, thus foreclosing defendant from obtaining protection from prison authorities. Defendant sought to establish his defense through the testimony of Officer Rosamaria Maldonado, the guard who had expressed concern about Addis's safety to Sergeant Sams, and two prison experts. Defendant himself did not testify.

By the time Rosamaria Maldonado testified, she had left the Department of Corrections after filing a stress claim seeking workers' compensation benefits. In that claim, she cited the Addis killing, among other incidents, as contributing to her stress. With respect to the events of August 3, 1997, she testified that Green had been insistent that Addis come out to the yard. She thought Addis might have safety issues if he went out to the yard, and she told Addis, "You must be packing for them because they're dying to see you." By this, she meant that Addis must be concealing drugs or weapons. He looked at her and smiled and she let him out into the yard. After releasing Addis into the yard, Maldonado observed that Green merely nodded and did not greet Addis as he usually did, with a hug and a kiss. When Maldonado walked back into the building, she told Sergeant Sams, "You know, Sarge, they're going to take him out." Sams responded, "Come on, we got a lot of work to do." She and Sams left the area to conduct cell searches. About two hours later, she heard a gas launcher in the exercise yard. She was one of the

7

officers who responded to the yard to help Addis. In addition, after he was carried out of the yard on a stretcher, she rode in the ambulance with him. Addis died as she was performing CPR on him.

At trial, Maldonado denied the existence of any conspiracy between the guards and Green to kill Addis, and denied that her fear for Addis's safety was anything other than a "gut feeling." She had previously been unaware that Addis had been placed in ASU because he had hit a guard. However, according to Dr. David Friedman, from whom she sought counseling, Maldonado told him that they knew "an inmate was to be killed. We all knew it. I told the supervisor that he would be killed if we let him out of his cell." She also told Dr. Friedman that she had told her sergeant, "They are going to kill him."

Confronted with these statements at trial, Maldonado claimed that Dr. Friedman had paraphrased what she told him, and that she did not make the statements he attributed to her. She denied telling him "I tried to stop it," or that "They killed him because they thought he was giving information to us, which he was. He used to talk to [Officer] Kaffenberger a lot." She similarly testified that statements attributed to her by Dr. Donald Feldman, who examined her in connection with her workers' compensation claim, were also paraphrases. In the statements attributed to her by Dr. Feldman, she allegedly said she had told Sergeant Sams an inmate was likely to be killed if they let him out of his cell, and that Sams had shrugged.

The defense also called as a witness James Gleisinger, who assisted Freidman in worker's compensation evaluations. Gleisinger testified that he interviewed Maldonado and set forth in his report Maldonado's verbatim statements to him. Among the statements in his report were: " 'She recalls "the most dramatic thing was about 18 months ago an inmate was to be killed. We all knew it. I told the supervisor that he would be killed if we let him out of his

8

cell," ' " and " ' "That inmate was let out even though everyone knew he would be killed if he was let out. I tried to stop it. That could open up a big can of worms. I told my sergeant that they're going to kill him. [¶] 'She states that Sergeant Sams "shrugged his shoulders." ' "

Two prison experts testified for the defense. Steven Rigg, a 17-year veteran of the Department of Corrections, from which he had retired in 1998 as an acting captain, reviewed materials relevant to the attack on Addis and testified that the guards had repeatedly mishandled the situation. In Rigg's opinion, Green should have been removed from the yard and disciplined for causing a disturbance by demanding that Addis be brought out. Rigg also testified that the guards should have known Green's demand that Addis be brought to the yard indicated trouble because Addis was not an NLR member and had been moved to a different tier under circumstances that showed he was in trouble with the NLR. The fact that Addis had stolen tobacco and "rolled off the tier" put him at risk. Rigg testified that once Maldonado informed Sergeant Sams that "they're going to take him out," the tower guard should have been instructed to remove Addis from the yard. According to Rigg, the fact that Addis was yard eligible should not have prevented Sams from removing him from the yard once he received information that Addis might be assaulted or killed. Rigg further testified that Green's initial failure to greet Addis, followed by his attempt to engage him, showed a "setup." Under those circumstances, the tower guard should have ordered the inmates to the ground and searched for weapons when he saw Green and defendant approach Addis as he was playing cards.

Rigg also testified about prison gangs generally. According to Rigg, if a gang member received an order from a gang leader to carry out an assault, he was expected to do so. If he failed, the inmate would put himself at risk to be assaulted or killed. Further, after carrying out the assault, the gang would expect the inmate

9

not to show any concern for the victim. To do so would be considered a sign of weakness.

Applying these observations to defendant's situation, Rigg opined that, had defendant failed to assault Addis, he would have been "a walking dead man." He could not have obtained assistance from the correctional staff without requesting protective custody, and even in protective custody, inmates have been assaulted and killed. Moreover, Rigg testified, the sequence of events showed that Sergeant Sams "possibly wanted [Addis] assaulted," in that Sams failed to take action to protect Addis. Furthermore, the light administrative punishment imposed on Green for his involvement in the attack — a 360-day credit loss without a term in ASU — showed, in effect, that the Department of Corrections "did not punish him for being involved in the conspiracy as charged, yet they found him guilty."[2]

Anthony L. Casas also testified as a prison expert. Casas had worked for over 22 years in the Department of Corrections, retiring as associate warden at San Quentin. He was particularly involved in dealing with prison gangs. Casas testified that inmates become involved in prison gangs in various ways. A gang may offer a new inmate protection in return for which the inmate will be expected to do the gang's bidding. If the inmate refuses, the gang will tell him he cannot disrespect the gang after it helped him. While some inmates who are big and

[2] Sergeant Sams accused Green of involvement in a conspiracy to assault Addis, and of ordering the "hit" on Addis. The hearing officer found the allegations to be true. On Ocrober 10, 1997, Green was given a warning and a reprimand, and was assessed 360 days of credit. He was also referred to the institutional classification committee for a program review and to the Bureau of Prison Terms (now Board of Parole Hearings) regarding his rule violation. Sergeant Sams did not recommend that Green be given a term in a security housing unit or any other special type of confinement. Green was paroled on October 30, 1997, 20 days after this punishment was imposed.

strong may be able to avoid gangs, someone like defendant, who is five feet six inches tall, and then weighed 150 pounds, might need the gang's protection. Additionally, an inmate serving a long prison term will do what he can to be protected in prison.

Casas testified that with most gangs, the only way out is death. If a gang orders a member to commit a crime and he fails to do so, "[h]e can easily be killed. As a matter of fact, in most cases where your gangs are disciplined enough, that's precisely what happens . . . . You follow or you're gone." Once an inmate has carried out an order to commit an assault, he is expected to show pride and brag about the crime. Any show of regret would be seen as a sign of weakness, and the inmate could be thrown out of the gang or killed. Casas testified further that inmates observe staff. Based on his review of how staff handled Addis, Casas opined that an inmate would have concluded it was useless to rely on staff for safety.

Like Rigg, Casas criticized the staff's handling of the situation in this case. He agreed that once Sams had been warned by Maldonado about the danger to Addis, Addis and Green should have been removed from the yard and an investigation should have been conducted. Like Rigg, Casas testified that Addis's yard eligibility would not have prevented Sams from removing him from the yard once Sams learned of the threat to Addis's safety.

**B. Penalty Phase**

*1. Prosecution Case*

The prosecution's penalty case in aggravation relied on multiple incidents of prior criminal activity by defendant involving "the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) To that end, the prosecution presented evidence that, while in prison,

11

defendant had committed multiple stabbings and attempted stabbings, and assaults on staff. It also presented evidence of numerous instances of assault and of possession of a weapon, all of them independent of those in the current case, including eight occasions on which he possessed a weapon, four instances of stabbing another inmate and one attempted stabbing of another inmate, a battery on an officer, and an assault on a staff member.

Additionally, the prosecutor's cross-examination of a defense witness brought out details of defendant's juvenile criminal record, which included two theft-related charges. The same witness also testified that when defendant was 19 years old, he pleaded guilty to three counts of residential burglary, one count of second degree burglary, and one count of grand theft of an automobile. In the same proceeding, six other theft-related counts were dismissed. Defendant was committed to the California Youth Authority for these offenses. The jury also heard about defendant's plea to one count of escape from the California Youth Authority, after which he was transferred to an adult prison.

### 2. *Defense Case*

As described by defendant in his appellate briefing, the defense case in mitigation "chronicled [defendant's] physical, sexual, and mental abuse as a child and the long-term consequences of those experiences, including posttraumatic stress disorder, multiple suicide attempts, schizoid personality disorder and bipolar disorder. [Defendant] also presented evidence that his criminal activity in state prison resulted from the denial of adequate mental health care and treatment by prison staff."

Testimony regarding defendant's family history was provided by his two maternal aunts, his maternal grandparents and his father. Both of defendant's parents were deaf. His mother, Linda, was described as having severe "mental

problems" that manifested themselves in the out-of-control behavior she displayed beginning in adolescence. For example, between the ages of 11 and 13, she set "a lot" of fires, including to the garage and to curtains in the living room. She once threatened one of her sisters with a knife. Later, she attacked a pregnant neighbor with a knife while the woman was showering and her husband was mowing the lawn. After that incident, she was removed from her parents' home and lived in a series of foster homes.

Linda married Gary Landry when she was 20 or 21. Their marriage was marked by constant fighting over what Gary perceived as Linda's deficiencies as a wife and a mother. When Gary learned that Linda was having affairs with women, he painted "bad wife" and "bad mother" on the walls of their residence. Linda drew graphic pictures of women having sex with each other on the walls above defendant's crib.

Neither parent nurtured or provided the basic necessities to defendant when he was an infant and toddler. Gary was a hard worker, but when he got home from work, he ignored defendant and instead spent time with his friends in the garage. Linda was a drug user and extremely neglectful mother. When members of her family would visit, they would discover defendant alone in his play pen, hoarse from crying and yelling. No one had responded to his cries. Linda's family installed a light-flickering system to alert her when defendant was crying. The house was filthy and defendant crawled on a floor littered with broken glass and curdled milk. When he was old enough to walk, defendant would get out of his crib and wander the neighborhood. His grandparents, who lived nearby, once discovered him asleep beneath their car. Another time, he was found scavenging for food in the neighbor's garbage cans.

When defendant was four years old, he went to live with his grandparents. A year later, his mother regained custody, but a few months later she returned him

13

to her parents permanently. When defendant first went to live with his grandparents, he did not talk, but grunted and pointed. He had nightmares and hoarded food beneath his bed. When he returned to his grandparents, they took him to mental health professionals because he seemed inaccessible. He continued to receive psychiatric care, including hospitalization, throughout his childhood and adolescence.

Nonetheless, defendant had problems outside the home, starting with being disruptive in kindergarten. He was repeatedly suspended in high school. At 15 years old, he and a friend burglarized the friend's house. When he was 16 or 17 years old, he stole a car, after which he entered the juvenile justice system and never again lived with his grandparents. He spent the rest of his adolescence at various juvenile camps from which he periodically attempted to escape. During this period, defendant was diagnosed as suffering from atypical depression and attention deficit hyperactivity disorder, for which he was medicated. It also emerged during his interviews with mental health professionals that he had been sexually abused by his father's best friend and by a friend of his mother's. Defendant was described by these mental health professionals as depressed and suicidal. All of these issues were related to the trauma he suffered in his first four years.

Defendant's adult criminal history began when, at 19 years old, he pleaded guilty to three counts of theft-related first degree residential burglary, one count of grand theft auto, and one count of second degree commercial burglary. In lieu of prison, he was sent to the California Youth Authority where he was evaluated by James Cueva, a casework specialist, who testified at defendant's trial. According to Cuevas, defendant was depressed and suicidal, and had no goals, plans, or expectations for life. Cuevas recommended intensive treatment for defendant to address his severe mental and emotional problems.

14

Dr. Joseph Lantz, a clinical psychologist, interviewed and tested defendant. He reviewed statements by defendant's aunts and spoke to his grandparents. Lantz testified that defendant's early years were akin to those of "a feral child," and produced the mental problems that plagued him into adulthood. He diagnosed defendant as suffering from "schizoid personality disorder," which is characterized by a "marked detachment from relationships." Victims of this disorder prefer solitude to human contact and are easily manipulated by other people. Lantz testified that, despite defendant's history, he was not "a character[o]logically violent person."

Dr. Frank Gawin, a psychiatrist, reviewed defendant's medical records and concluded that defendant suffered from bipolar disorder. He testified that prison officials were well aware that defendant suffered from this disorder as well as other emotional and psychological problems. Both defendant's grandmother and defendant himself had written to prison officials and elected officials requesting treatment for his mental health issues. According to Gawin, any treatment defendant received was "entirely inadequate."

Dr. Glenn Lipson, a forensic psychologist, testified about inmate mental health services in general, as well as defendant's particular case. He met with defendant and also reviewed records related to his mental health and treatment in custody. Lipson concluded defendant suffered from schizoid personality disorder and bipolar disorder. He testified that prison aggravated defendant's mental disease, and he attributed defendant's acts of violence in prison to the "diathesis-stress model" of behavior, i.e., the violent and stressful atmosphere of incarceration pushed defendant, who already suffered from mental illness, "over the edge." Based on his review of defendant's prison records, Lipson testified that the treatment defendant received failed to meet the standards required for inmate mental health services.

15

Finally, Anthony Casas, who had testified at the guilt phase, returned at the penalty phase to testify about conditions at Calipatria State Prison where defendant's first violent actions occurred. He testified that prison was staffed by inexperienced guards and less-than-qualified supervisors. The prison developed a reputation as being violent and out of control. Casas also testified that in 2000 he attempted to broker a deal in which defendant would provide information about the NLR to prison officials, but the officials concluded his information was stale. A similar deal with the Federal Bureau of Investigation failed to materialize because the San Bernardino District Attorney declined to participate.

## II. GUILT PHASE CLAIMS

### A. Review of Sealed Records

#### 1. Introduction

Defendant requests that this court review certain records to which the trial court denied him access in whole or in part following an in camera review, and determine whether the trial court abused its discretion in denying him discovery of those records. The records fall into three categories: (1) the confidential correctional inmate files maintained by the Department of Corrections for Daniel Addis, Gary Green and defendant himself (the C-files); (2) the personnel files of Correctional Officers Esqueda, Sams and Maldonado; and (3) additional medical and personnel files of Officer Maldonado pertaining to her medical retirement from the Department of Corrections.

#### 2. Background

##### a. C-files

Before trial, defendant served a subpoena duces tecum on the Department of Corrections, in which he sought his own C-file. (§ 1326.) Thereafter, he filed a pretrial motion for discovery in which he requested, among other things, the C-

16

files for Green and Addis. (§ 1054 et seq.) Defendant argued that discovery of the C-files was necessary for him to determine whether the hearing officer who conducted Green's rules violation hearing arising out of his participation in the assault on Addis had relied upon "undisclosed sources." He contended the files might (1) contain information to support his duress defense; (2) lead to evidence that correctional staff knew, or should have known, about the attack on Addis; and (3) disclose whether there were any internal investigations regarding the attack on Addis and if any correctional staff had been disciplined as a result of such investigations.

The Attorney General, representing the Custodian of Records for California State Prison at Corcoran, moved to quash the subpoena or, alternatively, for the court to conduct an in camera hearing to determine whether the files should be disclosed. The Attorney General argued that the files were presumptively privileged, and disclosure of them would be contrary to the public interest. (See Evid. Code, § 1040, subd. (b)(2) [a public entity may refuse to disclose confidential information if "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice"].) He asserted the discovery request was overbroad, and cited the need to protect individuals, such as informants, who would be endangered if their identities were disclosed. He further noted that if informants' identities were not kept confidential, inmates would be reluctant to cooperate in investigations. Finally, he urged that to protect the privacy rights of prisoners, confidential information regarding prisoners should not be released indiscriminately.

The trial court agreed to examine the three C-files in camera before trial to determine what, if anything, in them was discoverable. Following its review, the court granted defendant partial access to all three C-files, most extensively those

of Green, and to a lesser extent, defendant's own file. It disclosed a single page of Addis's file. During trial, defendant renewed his request to examine Addis's file after the prosecution turned over to him an incident report detailing Addis's assault on a correctional officer. The trial court denied the request.

### b. Officer Personnel Records

By subpoena duces tecum and an accompanying discovery motion, defendant sought the personnel files of 14 correctional officers. Defendant sought material from the files reflecting: (1) lack of credibility; (2) "dishonesty/untruthfulness/veracity/false arrest/conduct unbecoming an officer/neglect of duty"; and (3) acts of moral turpitude. The Attorney General, representing the California Department of Corrections, moved to quash the subpoena. The trial court preliminarily granted the discovery motion as to Officers Esqueda and Maldonado and Sergeant Sams. It denied the request for the personnel files of the remaining 11 officers based on defendant's failure to meet the threshold requirement of good cause for disclosure of police personnel records. (See Evid. Code, § 1043, subd. (b)(2); *Garcia v. Superior Court* (2007) 42 Cal.4th 63, 70-71.)[3] The trial court later reviewed the personnel files of Esqueda, Maldonado and Sams and concluded they contained no discoverable material.

### c. Records Related to Officer Maldonado's Retirement

After the trial had commenced, the prosecutor informed defense counsel that Officer Maldonado had retired a year after the assault on Addis because of "significant emotional and mental health issues" arising from her involvement in that incident. Defendant then served subpoenas on the State Compensation

---

[3] On appeal, defendant does not argue the trial court erred in concluding he had failed to show good cause for the personnel records of the other 11 officers.

Insurance Fund (SCIF) and the California Institution for Men (CIM), seeking records related to Maldonado's retirement from the Department of Corrections. The Attorney General, representing the California Department of Corrections, opposed the discovery request, arguing that the records were part of Maldonado's police personnel files as to which the court had already found no discoverable material.

The trial court conducted a hearing on the motion. It stated it had received records from SCIF and CIM related to Maldonado's retirement. Additionally, the records of Dr. Friedman, the psychiatrist who examined Maldonado in connection with her retirement, were produced by Dr. Friedman in response to a defense subpoena. Following an in camera review of the records, the court allowed counsel for both parties to copy any records from the Friedman file they found relevant. It denied the discovery motion as to the SCIF and CIM records, finding there was nothing relevant in those records that was not also contained in the Friedman file. Defendant later sought to discover records of an investigation into Maldonado's workers' compensation claim made by an entity called Singleton Investigations at the request of the SCIF. The trial court reviewed the records and found nothing discoverable.

### 3. Discussion

Evidence Code section 1040, subdivision (b)(2), authorizes the trial court to decline to disclose confidential records maintained by a public entity when it finds "the necessity for preserving the confidentiality of the information . . . outweighs the necessity for disclosure in the interest of justice." (See *People v. Suff* (2014) 58 Cal.4th 1013, 1059; *People v. Avila* (2006) 38 Cal.4th 491, 606.) This provision is applicable to prison inmate records. (*Ochoa v. Superior Court* (2011) 199 Cal.App.4th 1274, 1281.) As the *Ochoa* court observed, the state has a valid

19

interest in maintaining the confidentiality of such records to "(1) protect individuals, including informants inside and outside of prison, (2) ensure institutional security, and (3) encourage candor and complete disclosure of information concerning inmates from both public officials and private citizens." (*Id*. at p. 1280.)  In addition, disclosure of police personnel records requires a threshold showing of good cause after which the trial court "screen[s] law enforcement personnel files in camera for evidence that may be relevant to a criminal defendant's defense."  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225.)  In either case, the trial court's ruling is reviewed for abuse of discretion.  (*Avila,* at p. 607 [no abuse of discretion where trial court withheld access to a witness's parole records]; *People v. Hughes* (2002) 27 Cal.4th 287, 330 ["A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion"].)

Defendant asks that we review all records not disclosed to him by the trial court — the C-file records of defendant, Addis and Green, the personnel records of Officers Esqueda and Maldonado and Sergeant Sams, and the files of SCIF, CIM and Singleton Investigations related to Maldonado's retirement — and assess whether the trial court's rulings were proper.  "Parties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable 'must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record.' " (*People v. Price* (1991) 1 Cal.4th 324, 493.)  We have reviewed the record and conclude that the trial court did not abuse its discretion in rejecting disclosure of the materials.

We also conclude that the trial court's inadvertent failure to provide defendant with one document from Addis's C-file did not require the court to allow defendant to review Addis's entire C-file.  As noted above, during trial,

20

defendant renewed his request for access to Addis's file after the prosecution turned over to the defense an incident report regarding Addis's assault on a correctional officer. According to the prosecution, it had obtained the document from the person who investigated the assault by Addis, but the prosecution apparently did not realize the document was relevant until it heard defendant's opening statement, which reflected a theory that correctional officers were complicit in the attack on Addis. Because the trial court had also failed to disclose the document, the defense asked to be allowed to review Addis's entire C-file to see if it contained other relevant documents. The trial court responded that it had reviewed the file two more times, "page by page," and had discovered that the incident report at issue had been attached to a different report that involved a different incident. The court further stated that it found no other documents that were discoverable, and it denied defendant's request. We find no abuse of discretion in the court's decision and, as noted above, we have reviewed the file and found no discoverable documents.

Finally, defendant requests that the court allow appellate counsel to review Addis's C-file in accordance with appellate counsel's duty to "preserve evidence that comes to the attention of appellate counsel if that evidence appears relevant to a potential habeas corpus investigation." (Cal. Supreme Ct., Supreme Court Policies Regarding Cases Arising from Judgments of Death (2008) policy 3, std. 1-1.) We decline his request. The files are preserved in the appellate record.

## B. Denial of Motion to Sever Counts

Defendant contends the trial court abused its discretion in denying his motion to sever counts 1 and 2 (the attack on Addis) from counts 3 (the attack on Matthews) and 4 (possession of a weapon by an inmate). He further contends the denial of severance violated his rights to due process, a fair trial, a trial by jury,

21

and reliable capital case proceedings. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, subd. (a), 15, 16, & 17.) His contentions are without merit.

In the trial court, defendant argued that separate trials were required because (1) there was an absence of cross-admissible evidence between counts 1 and 2 (the killing of Addis) and counts 3 and 4 (the attack on Matthews and the custodial possession of a weapon); (2) the evidence supporting counts 3 and 4 was weaker than the evidence supporting counts 1 and 2; (3) consolidation would inhibit defendant's willingness to testify with respect to counts 1 and 2; (4) the Eighth Amendment required heightened scrutiny of joinder because counts 1 and 2 rendered him death eligible; and (5) judicial economy would be served by separate trials because counts 3 and 4 involved distinct incidents and distinct evidence. At defendant's request, the trial court also considered an in camera offer of proof regarding defendant's testimony and how consolidation might affect his willingness to testify.

In denying the motion, the trial court found that defendant had failed to make an adequate showing of a substantial danger of prejudice. The court found further that "the four charges involved conduct by the defendant while in prison in the California Institution for Men within a two-month period. Each occurred at [the] Palm Hall unit of [the] California Institute for Men. [¶] The offenses are of the same class of crime, either assaultive conduct by a prisoner or the possession of a prison-made weapon necessary to commit similar assaults. Each of the offenses involved prison-made weapons. Each of the assaults [was] committed with prison-made weapons against fellow prisoners. None of the charges appear to be weak in relation to the other. And the prejudice to the defendant would be small."

22

The joinder of charges is addressed in section 954: "An accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, under separate counts . . . ; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." The legislative preference for consolidation under either of the two circumstances set forth in section 954 is intended to promote judicial efficiency. (*People v. Capistrano* (2014) 59 Cal.4th 830, 851.)

Defendant presents two theories of error. First, he contends count 4 was not properly joined with the first three counts because count 4, custodial possession of a weapon, did not involve assaultive conduct, and therefore was not of the same class as count 1 (premeditated murder) and counts 2 and 3 (assault by a life prisoner). Second, he contends the trial court abused its discretion in declining to sever counts 1 and 2, which arose from the assault on Addis, from counts 3 and 4, which arose from the assault on Matthews and the possession of a weapon.

Joinder of the four counts was proper because the counts were all of the same class. "Offenses of the same class are offenses which possess common characteristics or attributes." (*People v. Smallwood* (1986) 42 Cal.3d 415, 424, fn. 5; see *People v. Kemp* (1961) 55 Cal.2d 458, 476.) With respect to the joinder of count 4 to the other counts, the trial court noted that all four offenses occurred in the custodial context and involved a prison-made weapon. In addition, sections 4500 (assault by a life prisoner) and 4502 (custodial possession of a weapon) serve an identical purpose — to prevent assaults by armed prisoners on prison staff and other inmates. (See *People v. Custodio* (1999) 73 Cal.App.4th 807, 812 ["By

23

prohibiting prison inmates from possessing any instrument or weapon of the kind specified in the statute, section 4502, subdivision (a) is intended to protect inmates and correctional staff 'from the peril of assaults with dangerous weapons perpetrated by armed prisoners' "]; *People v. Superior Court (Gaulden)* (1977) 66 Cal.App.3d 773, 778 ["Section 4500 was enacted for the purpose of promoting prison safety by discouraging assaults by prison inmates"].) Therefore, despite the fact that section 4502 does not require an intent to use the weapon (*People v. Rodriguez* (1975) 50 Cal.App.3d 389, 395), that offense as charged shares common characteristics with the assaultive offenses charged in this case, and is, therefore, of the same class.

Joinder was also proper because the offenses were "connected together in their commission." (§ 954.) "[O]ffenses which are committed at different times and places against different victims are nevertheless 'connected together in their commission' when they are, as here, linked by a ' "common element of substantial importance." ' [Citations.]" (*People v. Lucky* (1988) 45 Cal.3d 259, 276.) Here, the common thread among all four offenses is the use or possession by defendant of a prison-made stabbing weapon. Defendant contends the common element factor requires that the same weapon be involved in each crime. We rejected a similar argument in *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, in which the defendant claimed "only physical or objectively measurable factors, such as use of a specific individual weapon, can suffice" to establish the common element factor. (*Id.* at p. 1220.)

Accordingly, we conclude that count 4 was properly joined with the other three offenses under section 954.

In addition, because the evidence that defendant committed count 4 was strong and stood on its own without reference to the remaining counts, the evidence related to the other counts would not have improperly bolstered the

24

evidence pertaining to count 4. In light of the strength of the evidence related to each charge, "we cannot conclude that it is reasonably probable an outcome more favorable to defendant would have resulted" (*People v. McLain* (1988) 46 Cal.3d 97, 106) if count 4 had not been joined with the other counts. For the same reason, any misjoinder did not result in such gross unfairness as to deprive defendant of his right to due process. (*People v. Soper* (2009) 45 Cal.4th 759, 784 ["Appellate courts have found ' "no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials" ' "].)

As noted, defendant also contends the trial court abused its discretion by not severing counts 3 and 4 from counts 1 and 2. When charges are properly joined, a " ' "defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying defendant's severance motion." ' [Citation.] That is, defendant must demonstrate the denial of his motion exceeded the bounds of reason." (*People v. Capistrano, supra*, 59 Cal.4th at p. 848.) " 'Refusal to sever may be an abuse of discretion where (1) evidence of the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 30.) Even if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that "the joint trial resulted in such gross unfairness as to amount to a due process violation." (*Capistrano,* at p. 853.)

Applying the four-part standard outlined above, defendant first contends evidence was not cross-admissible among the four counts. The trial court did not expressly refer to cross-admissibility in its ruling denying severance, but its comments focused on the similarities among the counts — within a two and one-half month period, while housed in the Palm Hall unit of the CIM, defendant committed offenses involving prison-made weapons. As defendant acknowledges, the trial court's ruling reflects the view that there was a common plan or scheme to commit assaults with prison-made weapons.

To be admissible to prove a common plan or scheme, evidence of other misconduct "must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) The first three counts involved conduct to lull another inmate into a false sense of security followed by a surprise attack with a prison-made weapon. The fact that the attack on Addis occurred in the exercise yard in front of numerous witnesses and seemed to involve Green in the plan, whereas the attack on Matthews occurred while defendant was alone in his cell and with no participation by any other inmate, does not negate the significant similarities. (See *Alcala v. Superior Court, supra*, 43 Cal.4th at p. 1225 [the similarity required to admit evidence to prove a common plan "can be met despite the existence of some factual differences between or among the charged offenses"].) Thus, the trial court did not abuse its discretion in implicitly finding the evidence in these three counts to be cross-admissible. Like the other three counts, count four involved the possession of a prison-made stabbing weapon. Therefore, the other counts were admissible to establish a common plan to possess a prison-made weapon such as the sharpened metal object that fell to the floor when the gate to defendant's cell was opened.

26

In addition, as defendant concedes, "even the complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance." (*Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1221.) Rather, we look to the remaining three factors. (*Ibid.*) An examination of those factors does not reveal an abuse of discretion.

First, none of the joined charges was unusually likely to inflame the jury against defendant. Defendant asserts the evidence of the attack on Matthews and the possession of a weapon would lead the jury to infer improperly that defendant "had a general disposition to violence," and would "undercut his defense of duress and staff complicity and/or negligence in the Addis homicide based on the facts peculiar to that case." The fact that evidence of two violent crimes might lead a jury to infer that a defendant is violent does not establish that any of the charges were unusually likely to inflame the jury. In addition, to the extent defendant's attack on Matthews and his possession of a weapon tended to show he repeatedly acted pursuant to a common plan rather than due to duress or negligence, or with the complicity of staff, such inferences were proper.[4] Finally, as explained below, duress is not a defense to murder, nor does duress reduce murder to manslaughter. (See *post,* pp. 42-49.)

---

[4] Although it does not appear that the trial court was aware at the time it ruled on the severance motion of what defenses, if any, defendant would present to counts 3 and 4, we note, for purposes of evaluating whether the joint trial of these charges resulted in gross unfairness, that the defense presented evidence at trial that staff was complicit in the attack on Matthews. In particular, the defense elicited testimony from Matthews that he thought the officers allowed him to go to defendant's cell and "put [him] in a position for it to happen," and it presented expert testimony concerning how the officers should have escorted Matthews so he could not get away from them. Also, as noted above, the defense ultimately conceded guilt with respect to counts 3 and 4.

27

Second, counts 1 and 2 were not supported by evidence that was so measurably stronger than the evidence supporting counts three and four that it would likely have had an improper spillover effect on counts 3 and 4. Defendant contends the evidence of the attack on Addis was stronger because there were eyewitnesses to it, but the circumstantial evidence that he attacked Matthews was just as strong. Defendant called him over, Matthews complied and turned his back to the porthole of defendant's cell door, and then Matthews staggered away from defendant's cell bleeding while guards heard defendant evidently flushing his weapon down the toilet. Similarly, the discovery of a prison-made weapon in a cell solely occupied by defendant constituted strong circumstantial evidence that he possessed that weapon.

Third, "[t]he capital charges were not the result of joinder of the various incidents." (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.) Contrary to defendant's arguments, we do not apply a heightened standard in assessing severance issues in capital cases. (*People v. Trujeque* (2015) 61 Cal.4th 227, 260.)

Defendant further contends that the trial court should have granted severance because denial of the motion assertedly prevented him from taking the stand. He claims he could have offered a defense to the Addis counts that was inapplicable to the remaining counts, but would then have also had to testify concerning the remaining counts.

Defendant's theory of prejudice has been recognized by federal courts in interpreting their rule of procedure regarding severance, rule 14(a) of the Federal Rules of Criminal Procedure (18 U.S.C.). We noted in *People v. Sandoval* (1992) 4 Cal.4th 155, that we have not addressed this theory, and we concluded that the "[d]efendant's showing fell far short of anything that would have satisfied the federal standards or any standard this court might adopt." (*Id.* at p. 174.) We have subsequently considered this theory without adopting it as part of our severance

28

analysis. (See *People v. Johnson* (2015) 61 Cal.4th 734, 752; *People v. Thomas* (2012) 53 Cal.4th 771, 800.) Although the federal courts' test is based on their interpretation of the federal rule and is not grounded in constitutional mandate, we will assume, without deciding, that the type of prejudice recognized by the federal courts could justify a trial court's decision to sever otherwise properly joined charges under California law.

Although federal courts have interpreted their rule to permit severance when a defendant can show prejudice because he or she " 'wishes to testify to one charge but to remain silent on another' " (*U.S. v. Archer* (7th Cir. 1988) 843 F.2d 1019, 1022), they recognize that " 'severance is not mandatory every time a defendant wishes to testify to one charge but to remain silent on another. If that were the law, a court would be divested of all control over the matter of severance and the choice would be entrusted to the defendant.' " (*Ibid.*) Under the two-part test devised by the federal courts, "severance is required when a defendant demonstrates that he has *both* (1) important testimony to give concerning some counts and (2) a strong need to refrain from testifying with regard to other counts." (*U.S. v. Ely* (7th Cir. 1990) 910 F.2d 455, 457, italics added.) To satisfy the second part of the test, the defendant must demonstrate that his or her testimony on the counts about which he or she did not wish to testify was essential to the prosecution's meeting its burden of proof on those charges. (*Id.* at p. 460; *Archer,* at p. 1022; *U.S. v. Williamson* (5th Cir. 1973) 482 F.2d 508, 513.)

As noted, the trial court conducted an in camera hearing concerning defendant's desire to testify about the Addis attacks and how consolidation might affect his willingness to testify. At defendant's request, we have reviewed the sealed transcript of that hearing. The People have asked that the transcript be unsealed in the event it appears the trial court abused its discretion in denying severance. It is unnecessary to unseal the transcript, as defendant has failed to

29

satisfy the second part of the federal test.  There was ample independent evidence of his attack on Matthews (count 3) and his possession of the prison-made weapon (count 4), quite apart from any testimony he may have offered or declined to offer regarding those counts.  Accordingly, he fails to show he was prejudiced on this ground by the trial court's denial of his severance motion.

Defendant makes several related arguments that can be quickly dispatched. First, he claims the trial court failed to instruct the jury to consider and decide each count separately, but as he concedes, the trial court did not have a duty to give the instruction without a request.  (*People v. Beagle* (1972) 6 Cal.3d 441, 456.) Second, he claims the prosecutor committed misconduct by arguing that the jury could indiscriminately use the evidence of all counts to prove each count.  But defendant neither objected to the argument, thus forfeiting any claim of misconduct, nor did he request a limiting instruction.  (*People v. Lopez* (2013) 56 Cal.4th 1028, 1073; Evid. Code, § 355.)  Third, he claims judicial economy would have been served by severing counts 1 and 2 from counts 3 and 4 because counts 3 and 4 involved evidence that was not relevant to counts 1 and 2, and "there was every reason to believe that a verdict on the capital/murder charges would have led the parties to reach a disposition on other charges."  Evidence of the counts was cross-admissible, as explained above, and he cites no legal authority to support his novel and speculative theory regarding a disposition of the less serious charges.

Finally, defendant contends denial of his severance motion resulted in such gross unfairness as to amount to a violation of his federal due process rights. (*People v. Capistrano, supra,* 59 Cal.4th at p. 853.)  Other than the asserted prejudice we have already discussed and rejected, defendant points to no additional unfairness assertedly resulting from the joint trial.  We therefore conclude that defendant has failed to show a due process violation as the result of

30

the denial of his severance motion, or any violation of his rights to a fair trial, a trial by jury, and reliable capital case proceedings.

## C. Juror Questionnaire

Defendant contends the trial court erroneously rejected two questions he asked to be included on the jury questionnaire pertaining to the prospective jurors' attitudes about aspects of prison life. He contends the court's ruling violated his state and federal rights to due process, a fair trial, an impartial jury, and to a reliable determination of guilt and penalty in a capital case. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, subd. (a), 15, 16, & 17.)[5] The claim is meritless.

---

[5] "With respect to this and virtually every other claim raised on appeal, defendant urges that the error or misconduct he is asserting infringed various of his constitutional rights to a fair and reliable trial. In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17, applying *People v. Partida* (2005) 37 Cal.4th 428, 433-439.) "In the latter case, no separate constitutional discussion is required or provided where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Contreras* (2013) 58 Cal.4th 123, 139, fn. 17.) We apply this principle here and elsewhere where defendant asserts on appeal constitutional claims not advanced below.

### 1. Background

Defendant proposed the following multipart question (question No. 40) to be included in the juror questionnaire:

"What are your views on the prison system in the State of California?

"A. To what extent can you consider evidence that living in the prison system, that is to say being a prisoner, is an ongoing experience entirely different from living in society as you know it?

"B. Please indicate which statement best describes your opinion of life in the prison system prior to hearing evidence in this case:

"____ Prisoners are safer on the inside that they would be on the outside

"____ Prisoners are about as safe on the inside as they would be on the outside

"____ Prisoners are less safe on the inside than they would be on the outside

"C. Whatever your opinion as to the safety of living in the prison system may be, how willing are you to consider evidence that many prisoners' primary task on the inside is staying alive?"

The prosecutor objected to subparts B and C, asserting they were argumentative and called upon the prospective jurors to prejudge the case. The prosecutor also asserted that the questions were vague as to what was meant by prisoner safety. The trial court declined to include subparts B and C. Regarding the latter, even defense counsel conceded it was a "little argumentative," and proposed an alternative the trial court also declined to include. The court expressed its belief that the defense could ask follow up questions to subpart A "to get somewhat the same information, assuming it's an appropriately asked question." At the defense's request, a space was provided after subpart A with the words "Please explain." In its final form, subpart A (renumbered question No. 96,

32

subpart b on the questionnaire) read: "Would you be willing to consider evidence that living in the prison system, that is to say, being a prisoner, is an ongoing experience entirely different from living in society as you know it? Please explain."

### 2. *Discussion*

Defendant contends the trial court's rejection of his questions regarding prisoner safety denied him the opportunity to "expose juror bias about prison inmate safety and survival, to lay the foundation for challenges for cause, and to explore prospective jurors['] views on issues related to the circumstances of the charged capital offense that would be important to the decision of whether or not to impose the death penalty." As explained below, we find no abuse of discretion.

Preliminarily, we dispose of the People's claim that defendant forfeited this issue because, after further discussion and further revision of the questionnaire, defense counsel agreed the questionnaire could be used. By then, however, the trial court had already rejected subparts B and C, and it would have been futile for defense counsel to renew the argument. Accordingly, we find no forfeiture and proceed to the merits.

"There is no constitutional right to voir dire per se. Nor is there any constitutional right to conduct voir dire in a particular manner. [Citation.] Rather, the voir dire process serves as a means of implementing the defendant's Sixth Amendment right to an impartial jury. [Citations.] [¶] Consistent with applicable statutory law, the trial court has wide latitude to decide the questions to be asked on voir dire [citation], and to select the format in which such questioning occurs [citation]. The court likewise has broad discretion to contain voir dire within reasonable limits." (*People v. Contreras, supra,* 58 Cal.4th at p.143; fn. omitted; see Code Civ. Proc., § 223.) Thus, " ' "content" questions,' even ones that might

be helpful, are not constitutionally required.  [Citation.]  To be an abuse of discretion, the trial court's failure to ask questions 'must render the defendant's trial fundamentally unfair.'  [Citation.]  'Such discretion is abused "if the questioning is not reasonably sufficient to test the jury for bias or partiality." ' [Citation.]"  (*People v. Cleveland* (2004) 32 Cal.4th 704, 737; see also *People v. Leon* (2015) 61 Cal.4th 569, 586.)  It is not the purpose of voir dire to " 'educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.' "  (*People v. Crowe* (1973) 8 Cal.3d 815, 824.)

As defendant asserts, the issue of inmate safety and survival was "central to the defense to the capital/murder charges."  The principal purpose of the rejected questions appears to have been to begin educating the jurors about the defense. Moreover, as the prosecutor pointed out, the rejected questions were vague in that they did not specify what kind of threats to inmate safety and survival were at issue.  This vagueness itself created an opening for defendant to fill in the blanks with, again, the objective of previewing the defense and inviting agreement with his view of inmate safety and survival.  Finally, the trial court did not foreclose all questioning on this subject, but indicated it would allow the defense to pursue the subject should a prospective juror raise it in his or her answer to subpart A. Accordingly, we conclude that the trial court acted well within its discretion in rejecting the questions.  We conclude further that the rejection of the proposed questions did not implicate the issue of death-qualification voir dire.  (See *Wainwright v. Witt* (1985) 469 U.S. 412; *Witherspoon v. Illinois* (1968) 391 U.S. 510; *People v. Butler* (2009) 46 Cal.4th 847, 859 [the purpose of *Witherspoon-Witt* voir dire is to determine only the views of prospective jurors about capital punishment].)

**D. Admission of Defendant's Letters**

Defendant contends the admission of jailhouse letters he wrote to another NLR gang member violated his federal and state constitutional rights to due process, a fair trial, a trial by jury, and to reliable capital proceedings. (U.S. Const. 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, subd. (a), 15, 16, 17.) We disagree.

*1. Background*

Prison officials intercepted two letters defendant wrote to fellow NLR gang member, Joseph Lowery, who had once been defendant's cellmate. The officials photocopied the letters and then allowed them to be delivered to Lowery. The two letters were denominated People's exhibits Nos. 66 and 67. Exhibit No. 66 consisted of a photocopied envelope and a letter dated September 9, 1997, sent from CIM, at Chino, where defendant was then housed. The envelope had defendant's name, prison number and address. Exhibit No. 67 was an undated photocopied letter that was faxed to David Lacey, the investigating officer in this case, at CIM from an Officer Harrison at Corcoran State Prison on December 22, 1997, when defendant was housed at that institution. Glen Willett, the prosecution's prison gang expert, testified that prison authorities monitor prison gang members by intercepting their mail and reading it before passing it on. Lacey testified that outgoing letters by inmates are not allowed to be sealed. First, they are collected and read. If they contain information pertinent to an ongoing investigation, they are photocopied and the copies passed on to a supervisor. Finally, the original letters are delivered to their recipients. That was how Lacey obtained defendant's letters.

Willett, the prison gang expert, testified concerning the contents of the letters for purposes of identifying defendant as either an associate or a member of the NLR. With respect to exhibit No. 66, he testified that Lowery was a known

35

NLR gang member and that defendant's use of the phrase "dawg o' mine," was an endearment used among gang members. He testified further that the sentence, "Yeah, this 187 kinda put me at ease, had to earn it," meant that defendant had "to work hard" to commit the "murder," presumably the Addis homicide, and that committing the murder would elevate defendant's status with higher ranking NLR gang members like Lowery. With respect to exhibit No. 67, Willett testified defendant had signed it with his gang moniker "Smurf," and had made reference to being relocated. He testified the phrase "so the KGB has been befuddled once again," referred to prison authorities. He also noted defendant had again used the gang phrase "dawg o'mine," and well as the phrase "I hope this finds you in good health and strong mind," which is a reference to racial purity. Defendant also referred to Gary Green's gang moniker, "Mop," and to an Aryan Brotherhood gang member named Joseph Hayes who was then incarcerated at Pelican Bay.[6] Willett also testified that defendant's use of the word "homeplate," was another gang endearment that was the "same as 'homey.' "

Later in the trial, when the prosecutor moved for the admission of exhibit Nos. 66 and 67, the defense objected that there was no foundation that defendant wrote them. The prosecutor responded that the evidence showed Lowery and defendant were cellmates at one point, that defendant's prison number and address were written on the envelope in exhibit No. 66, and that "these are self-authenticating letters because of the content" and also because they were signed with defendant's gang moniker Smurf. Defense counsel argued there was no evidence regarding how prison officials obtained the letters. The prosecutor

---

[6] Willett testified that the NLR had begun as a feeder gang to the Aryan Brotherhood.

36

countered that Lacey's testimony regarding the interception and copying of inmate letters provided a proper foundation. She acknowledged, however, that it was not possible to establish who had originally collected the letters. The trial court admitted the letters.

### 2. Discussion

Defendant's argument regarding the admissibility of the letters is two-pronged. First, he contends the letters were inadmissible under the secondary evidence rule codified in Evidence Code section 1521. Second, he argues the letters were not properly authenticated under Evidence Code section 1401.

Evidence Code section 1521 provides in part: "The content of a writing may be proved by otherwise admissible secondary evidence. The court shall exclude secondary evidence of the content of writing if the court determines either of the following: [¶] (1) A genuine dispute exists concerning material terms of the writing and justice requires the exclusion. [¶] (2) Admission of the secondary evidence would be unfair." Enacted in 1998 — and thus applicable to defendant's 2001 trial — the secondary evidence rule replaced the best evidence rule, which was repealed. "Under the secondary evidence rule, the content of a writing may now be proved either 'by an otherwise admissible original' ([Evid. Code,] § 1520 or by 'otherwise admissible secondary evidence' ([Evid. Code,] § 1521, subd. (a); [citation])." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 269.)

Here, as noted, photocopies of the letters and the one envelope were admitted rather than the originals because, as Lacey explained, once the photocopies were made, the originals were delivered to their intended recipient. Defendant now asserts the admission of the copies was error. At no time did defendant object to admission of the documents under the secondary evidence rule. Rather, his objection went to their authenticity.

37

" 'As a general rule, "the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal." [Citation.] . . .' This rule applies equally to any claim on appeal that the evidence was erroneously admitted, other than the stated rule for the objection at trial." (*People v. Kennedy* (2005) 36 Cal.4th 595, 612; accord, Evid. Code, § 353.) This principle applies with particular force here, because before the trial court can exclude otherwise admissible secondary evidence, Evidence Code section 1521 requires the court to make specific factual determinations. These include whether a genuine dispute exists concerning material terms of the writing, and whether admission of the evidence would be unfair. The trial court cannot make such findings if a party fails to make a proper, specific, and timely objection, nor can we review the basis of the trial court's determination where no findings were made due to defendant's failure to have lodged the appropriate objection. Therefore, contrary to defendant's view, his various objections to Willett's interpretation of certain phrases in the letters did not amount to a proper objection under the secondary evidence rule. Accordingly, the claim is forfeited.

As noted above, defendant also contends the letters were not properly authenticated. A writing that qualifies for admission under the secondary evidence rule must, nonetheless, be authenticated before it can be admitted. "The Secondary Evidence Rule does not 'excuse[] compliance with [Evidence Code] Section 1401 (authentication).' ([Evid. Code] § 1521, subd.(c).) Thus, to be 'otherwise admissible,' secondary evidence must be authenticated." (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187, fn. omitted; see Evid. Code § 1401, subd. (b) ["Authentication of a writing is required before secondary evidence of its content may be received in evidence"].)

"Authentication is to be determined by the trial court as a preliminary fact ([Evid. Code,] § 403, subd. (a)(3)) and is statutorily defined as 'the introduction of

38

evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' ([Evid. Code,] § 1400)." (*People v. Goldsmith, supra*, 59 Cal.4th at p. 266.) "The means of authenticating a writing are not limited to those specified in the Evidence Code. ([Evid. Code,] § 1410 ['[n]othing in this article shall be construed to limit the means by which a writing may be authenticated or proved']; [citation].) For example, a writing can be authenticated by circumstantial evidence and by its contents." (*People v. Skiles, supra,* 51 Cal.4th at p. 1187.)

The testimony of Glen Willett and Officer Lacey was sufficient to sustain the trial court's finding of authenticity. Both men testified to the general protocol by which inmate letters are monitored and, when appropriate, copied and turned over to prison authorities as possible evidence in ongoing investigations. Defendant's letters were of obvious interest to Lacey, who was investigating defendant's attack on Addis. The envelope that was part of exhibit No. 66 showed as its return address defendant's address, along with his inmate number, and was sent while he was at CIM. Similarly, exhibit No. 67, the letter faxed to Lacey in December 1997 from Corcoran State Prison, was written while defendant was housed at that institution and refers to his having been relocated; he had in fact been transferred from CIM to Corcoran. The contents of the letter, about which Willett testified, lends further support for its authenticity. The reference to a "187," that is, a murder, and the context in which the reference is made, are inferentially references to the attack on Addis by defendant, for which he is claiming credit. Other references in the letters, to mutual acquaintances like Gary Green and Joseph Hayes, and defendant's familiar tone with the recipient, Lowery, his one-time cellmate, as well as his use of his own gang moniker, Smurf, also provide circumstantial support that he authored the letters. (See Evid. Code,

39

§ 1421: "A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing.")

Defendant argues that all of this information was known to individuals other than himself, making it possible that the letters were forged. However, " '[a]s long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' [Citation.]" (*People v. Goldsmith, supra,* 59 Cal.4th at p. 267.)

Accordingly, we conclude the trial court did not abuse its discretion in admitting exhibit Nos. 66 and 67 into evidence.

**E. Excusal of Sick Juror**

On the day set for closing arguments and instruction, the court, over defendant's objection, excused a sick juror and seated an alternate. Defendant contends the trial court's decision to replace the sick juror was an abuse of discretion and also violated his federal and state constitutional rights to a fair and impartial jury trial and a reliable penalty determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, subd. (a), 15, 16, 17.) The claim is meritless.

*1. Background*

On the morning of April 18, 2001, the day set for closing arguments and instructions, the trial court informed counsel that Juror No. 10 had called in sick with the flu. The court indicated it was inclined to replace the juror because the "flu that's going around does not seem to be something that will get well [*sic*] in a day or two." Defense counsel requested and was granted a recess to review his jury list and consult with defendant. When the proceedings resumed, defense

counsel objected to replacing the sick juror and asked the court to wait for a day to see whether the juror had recovered. The prosecutor suggested the court speak to the juror directly. With consent of both counsel, the trial court telephoned the juror and put her on speakerphone. The juror reported she had been vomiting all night and did not anticipate recovering that week. The judge asked if she would be available on Monday, to which she said yes, although she acknowledged she had not been to the doctor.

After speaking to the juror, the court noted that a delay from Wednesday to Monday would result in the loss of three court days. Defense counsel stated "it's reasonable to wait for that person until Monday." The trial court, however, excused Juror No. 10 and replaced her with an alternate.

### 2. Discussion

Section 1089 states in pertinent part that "[i]f at any time, whether before or after the final submission of the case to the jury, a juror . . . becomes ill . . . , the court may order the juror to be discharged" and replaced by an alternate juror. "We review such a decision for abuse of discretion." (*People v. Smith* (2005) 35 Cal.4th 334, 348-349.) "The court's discretion is not unbounded: it must determine whether good cause exists to discharge the juror, and its reasons for discharge must appear in the record as a demonstrable reality." (*People v. Roberts* (1992) 2 Cal.4th 271, 325.) The trial judge is not required, however, to "elicit conclusive proof of the length of future incapacitation; judges are lawyers, not doctors." (*People v. Duff* (2014) 58 Cal.4th 527, 560, fn. omitted.) Nor must the incapacitation exceed a specific length of time. "[I]n the right circumstances, an absence of a day or less may warrant excusal. [Citations.] Whether a juror's illness can best be accommodated by a continuance or replacement with an alternate is a matter committed to the trial court's discretion." (*Id*. at pp. 560-561.)

41

Here, there is no dispute the juror was ill. Although she believed she might be well the following Monday, five days and three court days later, this was merely an estimate on her part. Meanwhile, as defendant acknowledges, the trial had gone on for almost two months and was set to enter its final phase of closing argument and instruction on the day the juror called in sick. Whether, as he insists, a three-day continuance would have been reasonable is not the question we must answer. The question is whether, under these circumstances, the trial court's decision to proceed with an alternate juror was an abuse of discretion. In light of the uncertainty of the juror's prognosis and the crucial point at which the trial had arrived, we conclude the trial court did not abuse its discretion.

## F. Claims of Instructional Error

### 1. Instructions Regarding Duress

Defendant contends the trial court's denial of four proposed defense instructions concerning duress violated his federal constitutional rights to due process, effective assistance of counsel and a reliable penalty determination. (U.S. Const., 5th, 6th, 8th and 14th Amends.) The claim is meritless.

The defense of duress is set forth in section 26, which states in relevant part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Six — Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." As noted above, defendant argued that his attack on Addis, the basis of counts 1 and 2, was committed under duress because the attack was ordered by the NLR and, had defendant failed to carry it out, he himself would have been killed.

42

To establish the defense, defendant requested four duress instructions, two pertaining to the first degree murder charge (count 1) and two to the charge of assault by a life prisoner with malice aforethought (count 2.)[7] The trial court

7    The four requested instructions were as follows:

1.  "In this case, you may consider evidence showing the existence of threats, menaces or compulsion that played a part in inducing the unlawful killing of a human being for such bearing as it may have on the question of whether the murder alleged in Count 1 was of the first or second degree.  If you find from the evidence that at the time the alleged crime was committed the defendant honestly and reasonably held a belief that his own life was in danger, you must consider what effect, if any, this belief had on the defendant and whether he formed any of the specific mental states that are essential elements of murder.  [¶]  Thus if you find he had an honestly and reasonably held belief that his life was in peril and as a result did not maturely and meaningfully premeditate, deliberate and reflect on the gravity of his contemplated act or form an intent to kill, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree."  [¶]  Also, if you find the defendant did not form the mental state constituting express malice, you cannot find him guilty of murder of either the first or second degree. You may however, find him guilty of the crime of voluntary manslaughter as defined in these instructions."

2.  "The distinction between murder and manslaughter is that murder requires malice while manslaughter does not.  [¶]  When the act causing death, though unlawful, is done under the actual and reasonable belief in the necessity to act because of imminent peril to life or great bodily injury, the offense is manslaughter. In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent.  [¶]  To establish that a killing is murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused death was not done under the actual and reasonable belief in the necessity to act because of imminent peril to life or great bodily injury."

3.  "With respect to Count 2, the crime of Assault By A Life Prisoner With Malice Aforethought is not committed unless the element of malice aforethought is proved.  [¶]  If you find that the defendant acted under the actual and reasonable belief in the necessity to act because of imminent peril to life or great bodily injury, there is no malice aforethought and the crime alleged in Count 2 is not committed. [¶]  As to this alleged offense, the burden is on the People to prove beyond a reasonable doubt each of the elements of the offense and that the act which caused death was not done under the actual and reasonable belief in the necessity to act because of imminent peril to life or great bodily injury."

4.  "In this case, you may consider evidence showing the existence of threats, menaces or compulsion that played a part in inducing the unlawful assault

*(footnote continued on next page)*

43

rejected the instructions on the ground that there was insufficient evidence that defendant personally entertained a good faith belief that his action — attacking Addis — was necessary because his own life was in danger.

Nonetheless, in response to the prosecutor's request that the court "say something about" duress, the court gave a modified version of CALJIC No. 4.40 (Threats and Menaces) as follows: "A person is not guilty of a crime other than Assault by a Life Prisoner as alleged in Count 2 when he engages in conduct, otherwise criminal, when acting under threat and menace under the following circumstances: [¶] 1. Where the threat and menace are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and [¶] 2. If this person then believed that his life was so endangered. [¶] This rule does not apply to threats, menaces, and fear of

---

*(footnote continued from previous page)*

upon inmate Addis resulting in death of the inmate as alleged in Count 2, for such bearing as it may have on the question of whether that crime was committed. If you find from the evidence that at the time the alleged crime was committed the defendant honestly and reasonably held a belief that his own life was in danger, you must consider what effect, if any, this belief had on the defendant and whether he formed any of the specific mental states that are essential elements of this particular crime. Thus if you find he had an honestly and reasonably held belief that his life was in peril and as a result did not form the mental state constituting malice aforethought, which is an element of the crime, you may not find him guilty of said crime. [¶] You may however, find him guilty of the crime of any lesser included offenses such as assault with a deadly weapon as defined in these instructions."

Defendant acknowledges the proposed instructions are erroneous in two respects: first, the requirement that a defendant maturely and meaningfully reflect upon his or her act had been eliminated from section 189 prior to defendant's trial and, second, the instruction erroneously stated express malice was required for murder when section 189 states that such malice may be either express or implied.

44

future danger to his life, nor does it apply to the crime of Assault By a Life Prisoner as alleged in Count 2."**8**

We need not decide whether the trial court was correct that there was insufficient evidence to support the requested instructions, because we have since held that duress is not a defense to murder, nor does duress reduce murder to manslaughter. (*People v. Anderson* (2002) 28 Cal.4th 767, 772-785 (*Anderson*); see *People v. Burney* (2009) 47 Cal.4th 203, 249-250; *People v. Hinton* (2006) 37 Cal.4th 839, 882-883; *People v. Wilson* (2005) 36 Cal.4th 309, 331-332; *People v. Maury* (2003) 30 Cal.4th 342, 421-422.)

In *Anderson, supra*, 28 Cal.4th 767, the defendant urged the court to construe section 26 to exempt only capital crimes from the defense of duress. In response, we noted that at common law, duress was not a defense to killing an innocent person. (*Id*. at p. 772.) We further observed that when California recognized the defense in 1850, all murder was punishable by death. We concluded that as enacted, "section 26 effectively adopted the common law" (*Anderson, supra,* at p. 774), thereby barring duress as a defense to murder. In the course of our discussion, we observed that "[i]f duress is recognized as a defense to the killing of innocents, then a *street or prison gang* need only create an internal

---

**8**     The instruction's exclusion of the crime of assault by a life prisoner reflects section 26's exclusion of "crime[s] punishable by death" from the defense of duress. (See § 4500.) In the trial court, defense counsel acknowledged that his proposed instructions on the effect of duress on count 2, which charged assault by a life prisoner in violation of section 4500, was foreclosed by the explicit language of section 26. For this reason, we reject defendant's claim that the trial court erred in failing to instruct that duress could serve as a basis for the jury to reduce count 2 to assault with a deadly weapon. For this purpose, we assume, without deciding, that defense counsel's acknowledgement that section 26 did not apply to count 2, and his agreement to the modified duress instruction given, which specifically excluded count 2, did not forfeit the claim.

reign of terror and murder can be justified, at least by the actual killer." (*Id.* at p. 777, italics added.)

We also rejected the defendant's theory that even if duress is not a complete defense to murder, "at least it reduces the crime to manslaughter by negating malice." (*Anderson, supra,* 28 Cal.4th at p. 781.) We noted that for purposes of voluntary manslaughter — an unlawful killing without malice — the absence of malice is limited to two circumstances: " ' "when the defendant acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or when the defendant kills in 'unreasonable self-defense' — the unreasonable but good faith belief in having to act in self-defense [citations]." ' " (*Ibid.*) We observed that "[n]either of these two circumstances describes the killing of an innocent person under duress." (*Ibid.*) We declined to carve out a third circumstance negating malice, based on duress. Unlike a person who has an unreasonable belief it is necessary to kill in self-defense, and therefore intends to kill lawfully, "a person who kills an innocent believing it necessary to save the killer's own life intends to kill unlawfully, not lawfully." (*Id.* at p. 783.) We recognized that policy arguments could be made to recognize duress as a factor reducing culpability, but observed that "because duress can often arise in a criminal gang context, the Legislature might be reluctant to do anything to reduce the current law's deterrent effect on gang violence. These policy questions are for the Legislature, not a court, to decide." (*Id.* at p. 784.) Defendant sets forth no argument that persuades us to reconsider these conclusions.

Defendant seeks to avoid *Anderson*'s holding on the basis that *Anderson* did not consider whether duress may be a defense to murder as a matter of federal constitutional law. He maintains that evolving standards of decency and heightened requirements of a reliable death penalty pursuant to the Eighth Amendment require recognition of duress as a defense to murder. Defendant does

46

not cite any case that has so held, and we are not persuaded that his citation to legal commenters represents a national consensus that has developed against the rule we announced in *Anderson.* (Cf. *Atkins v. Virginia* (2002) 536 U.S. 304, 313-317 [tracing legislative actions prohibiting the execution of intellectually disabled persons as evidence of a national consensus against that practice].)

Defendant also asserts that his federal constitutional rights to due process and to present a defense required the trial court to give his proposed instructions and allow the jury to consider whether his claim of duress created a reasonable doubt regarding malice. The high court has acknowledged, however, that "dealing with crime is much more the business of the States than it is of the Federal government, [citation], and [it] should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States. (*Patterson v. New York* (1977) 432 U.S. 197, 201 [New York statute allocating burden on defendant to prove affirmative defense of extreme emotional disturbance does not violate the due process clause].) "When a State's power to define criminal conduct is challenged under the Due Process Clause, we inquire only whether the law 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' [Citation.]" (*Montana v. Egelhoff* (1996) 518 U.S. 37, 58 (conc. opn. of Ginsberg, J.) [Montana statute eliminating voluntary intoxication as a defense does not violate due process].)

Consistent with these principles, the United States Court of Appeals for the Fifth Circuit rejected a claim that Louisiana's statute excluding duress as a defense to murder violated the defendant's federal due process rights.[9] "The state

---

[9] The Louisiana statute permits a justification defense "[w]hen any crime, except murder, is committed through the compulsion of threats by another of death or great bodily harm, and the offender reasonably believes the person making the

*(footnote continued on next page)*

47

legislatures have vast powers to establish the elements of crimes, subject to the substantive provisions of the Constitution. [Citations.] Where a fundamental right is involved, the state's legislative authority must yield. [Citation.] Obviously, there is no fundamental right to commit murder, even under duress. Substantive due process is not implicated." (*Glass v. Blackburn* (5th Cir. 1986) 791 F.2d 1165, 1171.)

As we noted in *Anderson*, section 26 represents a legislative decision to adopt the common rule excluding duress as a defense to murder. (*Anderson, supra,* 28 Cal.4th at p. 774.) California's position is consistent with the majority of states that have considered the issue and adopted the common law rule. (*U.S. v. LaFleur* (9th Cir. 1992) 971 F.2d 200, 205, and statutes and cases cited therein.) The Legislature's adoption of the venerable common rule excluding duress as a defense to murder does not implicate a fundamental right. Accordingly, we reject defendant's claim that federal constitutional law required the trial court to give the requested instructions.

Finally, defendant contends the trial court should have instructed the jury that evidence of duress could negate premeditation and deliberation, thereby resulting in second degree murder. (See *Anderson, supra,* 28 Cal.4th at p. 784 ["We agree that a killing under duress, like any killing, may or may not be premeditated, depending on the circumstances"].) In *Anderson*, we concluded this concept was sufficiently addressed by language in CALJIC No. 8.20 (Deliberate and Premeditated Murder) instructing the jury that "a killing 'upon a sudden heat

*(footnote continued from previous page)*

threats is present and would immediately carry out the threats if the crime were not committed . . . ." (La. Rev. Stat. § 14:18(6) available from La. State Legis. Online at https://legis.la.gov/Legis/Law.aspx?d=78335 [as of December 12, 2016].)

of passion or *other condition precluding the idea of deliberation'* would not be premeditated first degree murder." (*Anderson, supra*, at p. 784.) Not only was CALJIC No. 8.20 given in this case, but, as noted, defendant received the unwarranted benefit of a modified duress instruction. We reject defendant's contention that these instructions were inadequate on this point.

### 2. CALJIC No. 8.20

Defendant contends that the use of the word "precluding" in CALJIC No. 8.20 (Deliberate and Premeditated Murder) in referring to circumstances that would negate the element of deliberation effectively lowered the prosecution's burden of proof and violated his federal and state constitutional rights to due process, trial by jury and a reliable penalty determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, subd. (a), 15, 16, 17.)

As given in this case, CALJIC No. 8.20 provided:

"All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. The word 'willful,' as used in this instruction, means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition *precluding* the idea of deliberation, it is murder of the first degree." (Italics added.)

Defendant contends that, in context, the instruction required the jury to find evidence that would have entirely prevented deliberation before the jury could find

49

the crime to be less than first degree murder, a more onerous standard than requiring merely that the evidence raise a reasonable doubt. He asserts: "The jury should have been instructed that, if it found evidence of a sudden heat of passion or other condition sufficient to giv[e] rise to a reasonable doubt of deliberation, it must give the defendant the benefit of the doubt and find him not guilty of first degree murder." He relies on various legislative, dictionary and judicial usages of the word "precluding" to support his view that the jury would have understood the word to mean "prevent entirely."

The People respond that the claim is forfeited by defendant's failure to seek modification of the instruction or by his attorney's agreement to the instruction. Assuming defendant's argument challenges the correctness of the instruction and therefore is not forfeited (see § 1259), it is nonetheless meritless.[10]

As defendant acknowledges, we have previously considered and rejected an identical challenge to CALJIC No. 8.20. In *People v. Nakahara* (2003) 30 Cal.4th 705 (*Nakahara*), the defendant contended that the word "precluding" in CALJIC No. 8.20 was "too strong and could be interpreted as requiring him to absolutely preclude the possibility of deliberation, as opposed to merely raising a reasonable doubt on that issue." (*Nakahara* at p. 715.) We concluded that "this instruction is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof. These instructions make it clear that a defendant is not required to absolutely preclude the element of deliberation." (*Ibid.*; accord, *People v. Pearson* (2012) 53 Cal.4th 306, 326; *People v. Morgan* (2007) 42 Cal.4th 593, 620-621.)

---

[10]    Pursuant to section 1259, an appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

50

Defendant asserts that *Nakahara* should not control because it did not consider the various usages of "precluding" that he presents here and that he has drawn from sources other than jury instructions. In considering a claim of instructional error, however, we do not look far and wide for all possible usages of a word the defendant has singled out as error nor do we focus solely on that single word. Rather, "[t]he relevant inquiry here is whether, 'in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice.' [Citation.] Also, ' " 'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation]." ' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.) This was the standard we applied in *Nakahara* as is evident by our references to the others instructions pertinent to CALJIC 8.20. We apply the same standard here and again reject this challenge to CALJIC No. 8.20.

### 3. *Implied Malice Second Degree Murder Instruction*

Defendant contends the trial court erred by failing to instruct the jury, on its own motion, concerning the lesser included offense of implied malice second degree murder.[11] He asserts the error violated his rights to due process and a trial by jury, and the proscription against cruel and unusual punishment. (U.S. Const., 5th, 6th, 8th & 14th Amends.) We find no error.

---

[11] Defendant contends the trial court should have instructed the jury with CALJIC No. 8.31 (Second Degree Murder — Killing Resulting From Unlawful Act Dangerous To Life), as follows:

"Murder of the second degree is also the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being." (CALJIC No. 8.31.)

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, *but not the greater*, offense. 'The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence.' [Citation.] In light of this purpose, the court need instruct the jury on a lesser included offense only '[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of' the lesser offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403-404, italics added.)

A finding of express malice requires evidence of an intent to kill, whereas a finding of implied malice requires only an "intent to do an act dangerous to human life with conscious disregard of its danger." (*People v. Breverman* (1998) 19 Cal.4th 142, 188.) Here, there is no substantial evidence that defendant intended only to commit an action that was dangerous to human life, and did not intend to kill. The evidence reflects that Gary Green ordered a hit on Addis, and defendant contended at trial that if he had not carried out the hit, he would have been killed. After Green demanded that Addis be let into the yard, Green and defendant walked around together in the yard and ignored Addis. Thereafter, defendant told Addis, "It's all right, Danny. Go ahead and play cards." Ten or 15 minutes later, Green and defendant walked together to the card table, and defendant stood to the left of Addis. One or two minutes after that, defendant, with one strong blow to Addis's neck, severed his jugular and subclavian veins. In a letter to another gang member, defendant stated that he had to work to earn this murder, and that committing the murder would elevate his status with higher ranking NLR gang

52

members.  These facts reflect an intent to kill, and cannot be construed to reflect only an intent to commit a dangerous act with conscious disregard of its danger.

Defendant directs us to cases in which courts found sufficient evidence of implied malice based on an assault with a knife.  (see, e.g., *People v. Pacheco* (1981) 116 Cal.App.3d 617, 627.)  He also points to evidence that he and Addis were "having words" just before defendant stabbed him, and that Addis had previously threatened harm to defendant.  Although it is true that an assault with a knife may reflect implied malice, the issue here is whether there is substantial evidence that defendant acted with only a conscious disregard for human life.  He does not explain how the evidence he cites — his use of a knife, "words" before the assault, and a threat on some prior occasion — constituted substantial evidence that he acted only with conscious disregard for human life.  On the contrary, all of the relevant evidence reflects an intent to kill.

### 4. *Voluntary Manslaughter Instruction*

As previously noted, defendant requested voluntary manslaughter instructions on a duress theory that the trial court rejected.  On appeal, he contends the trial court had a duty to instruct the jury, on its own motion, regarding three other theories of voluntary manslaughter:  sudden quarrel or heat of passion; imperfect self-defense; and assault with a deadly weapon without malice aforethought.  He claims the trial court's failure to do so violated his state and constitutional rights to due process, trial by jury, a fair trial, and a reliable penalty determination.  (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const. art. I, §§ 7, subd. (a), 15, 16.)  The claim is meritless.

As noted above in our discussion of defendant's claim of instructional error regarding duress (*ante*, pp. 42-49), the element of malice may be negated by evidence that (1) the defendant acted in a sudden quarrel or heat of passion, or (2)

53

the defendant unreasonably but in good faith believed it was necessary to act in self-defense.  If either of these circumstances is found, an unlawful killing will be voluntary manslaughter rather than murder.  "Only these circumstances negate malice when a defendant intends to kill."  (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.)

The heat of passion sufficient to reduce murder to manslaughter "exists only where 'the killer's reason was actually obscured as a result of a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " ' " (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)  The belief required to support imperfect self-defense is that the defendant "was in imminent danger of death or great bodily injury."  (*People v. Booker* (2011) 51 Cal.4th 141, 182.)  This doctrine is a " 'narrow' " one and "will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that ' " '*must be instantly dealt with.*' " ' " (*People v. Rogers* (2006) 39 Cal.4th 826, 883.)

A trial court must instruct a jury regarding lesser included offenses " ' "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury  [Citations.]  'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater was committed." ' " (*People v. Sattiewhite, supra,* 59 Cal.4th at p. 477.)

Defendant identifies the same evidence to support each of these two theories of voluntary manslaughter.  First, Richard Allen, a former inmate, testified that he heard defendant and Addis "having words" just before the fatal attack.  Second, one of defendant's letters to Joseph Lowery included a statement that the victim had decided to "disrespect me, and threaten harm to me" and "to

54

kill me on the yard." Undermining this evidence, however, is the fact that Allen also testified that the victim, who was seated at a table playing cards when defendant approached him from behind, did not threaten defendant. Furthermore, Allen's belief that the two were arguing was based solely on the tone of defendant's voice, which "sounded angry." Finally, Allen did not hear what the two men were saying to each other. Regarding the letter, defendant did not identify when the alleged threat occurred. This evidence, even if credited, does not begin to demonstrate either provocation for purposes of heat of passion voluntary manslaughter or imminence of danger of death for purposes of imperfect self-defense voluntary manslaughter. Accordingly, the trial court was not required to instruct on either theory.

Last, defendant cites *People v. Garcia* (2008) 162 Cal.App.4th 18, in support of his contention that the trial court should have instructed the jury concerning voluntary manslaughter because there was evidence he committed an assault with a deadly weapon without malice aforethought. His reliance on *Garcia* is in vain, that decision having been disapproved by this court in *People v. Bryant* (2013) 56 Cal.4th 959, 970, on the very point for which he cites it. In *Bryant*, we held that a killing without malice in the commission of an inherently dangerous assaultive felony "cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life." (*Ibid.*) Accordingly, this argument is foreclosed by *Bryant*.

### 5. *Expert Testimony as Circumstantial Evidence*

Defendant contends the trial court erred by failing to instruct the jury, on its own motion, that its instructions on circumstantial evidence applied specifically to expert testimony. He asserts the error violated his federal and state federal constitutional rights to due process, trial by jury, a fair trial, and a reliable penalty

determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal Const., art. I, §§ 7, subd. (a), 15, 16, 17.) The claim is both forfeited and meritless.

The trial court gave two standard instructions on circumstantial evidence, CALJIC Nos. 2.01 and 2.02, neither of which expressly refers to expert testimony.[12] Characterizing expert testimony as a form of circumstantial evidence, defendant contends the trial court should have informed the jury that the

---

[12] As given here, CALJIC No. 2.01 stated in full: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to his guilt. [¶] If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

CALJIC No. 2.02, as given here, stated in full: "The specific intent and/or mental state with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find the defendant guilty of the crime charged in Counts 1, 2, or 3 unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required specific intent and/or mental state but (2) cannot be reconciled with any other rational conclusion. [¶] Also, if the evidence as to specific intent and/or mental state permits two reasonable interpretations, one of which points to the existence of the specific intent and/or mental state and the other to its absence, you must adopt that interpretation which points to its absence. If, on the other hand, one interpretation of the evidence as to the specific intent and/or mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

56

principles expressed in those instructions applied to expert testimony. More specifically, he contends the court should have instructed that "if the expert testimony permitted two reasonable inferences, one of which points to defendant's innocence and the other to his guilt, the jury must adopt that interpretation that points to the defendant's innocence, and reject that interpretation that points to his guilt."

Defendant does not assert that the circumstantial evidence instructions were incorrect statements of law. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024; accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1166; *People v. Lewis* (2001) 26 Cal.4th 334, 380.) Accordingly, the claim is forfeited.

The claim is also without merit. Defendant cites no authority for the proposition that a trial court is required to specify the evidence or the issues to which the instructions regarding circumstantial evidence apply. And for good reason: how a general instruction applies to specific evidence or theories is an argument for counsel to make.

### 6. *Refused Modification of CALJIC No. 2.11.5*

Defendant contends the trial court erred when it denied his proposed modification to CALJIC No. 2.11.5 (Unjoined Perpetrators of the Same Crime). His asserts the error violated his federal and state constitutional rights to a fair trial, to a trial by jury, to present a defense, and to a reliable penalty determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal Const. art. I, §§ 7, subd. (a). 15, 16, 17.) The claim is meritless.

57

The trial court gave CALJIC No. 2.11.5 as follows: "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which that defendant is on trial. [¶] There may be many reasons why that person is not here on trial. Therefore, do not speculate or guess as to why the other is not being prosecuted in this trial or whether he has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of the defendant on trial."

The instruction was intended to apply to defendant's cellmate, Gary Green, who participated in the attack on Addis, but was not on trial. An internal rules violation investigation by the Department of Corrections concluded that Green was involved in the conspiracy to assault Addis and noted there was information that Green had ordered the hit on Addis. Green was assessed a 360-day credit loss. However, 20 days after this disciplinary hearing, he was paroled. Based on this record, defendant's gang expert, Steven Rigg, testified that Green was not punished for his participation in the conspiracy.

In light of this evidence, defense counsel requested a modification of CALJIC No. 2.11.5 to include the following language: "You may, however, consider the actions taken against Mr. Green by members of the Department of Corrections to the extent same have been proved in this case as they bear upon issues of fact which you are asked to determine." The prosecutor, while noting the defense was free to argue its theory that correctional officers were complicit in the assault on Addis, objected to the modification of CALJIC No. 2.11.5 because it "takes away what this jury instruction is saying." That is, it invited speculation as to why Green had not been prosecuted for the Addis murder. Defense counsel argued the modification "clarif[ied] the behavior of the Department of Corrections toward Mr. Green, independent of any prosecutorial decisions that may be relevant to the facts in this case." The trial court rejected the proposed modification.

58

There was no error.  Defendant does not contend, nor could he, that CALJIC 2.11.5 was either inapplicable to this case or flawed as given.  (See *People v. Brown* (2003) 31 Cal.4th 518, 560 [purpose of the instruction " 'is to discourage the jury from irrelevant speculation about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offenses, and also to discourage speculation about the eventual fates of unjoined perpetrators' "].)  The proposed modification would have simultaneously instructed the jury it could not consider the prosecution's reasons for not prosecuting Green, but it could consider the actions of the Department of Corrections in giving him assertedly lenient punishment for his part in the attack on Addis.  As the prosecutor here noted, this conflation of the actions of the District Attorney's Office and the Department of Corrections could only have confused the jury and potentially eviscerated the instruction.  Accordingly, the trial court properly rejected the proposed modification.

Moreover, even without the proposed modification, nothing prevented the defense from making its argument that the assertedly lenient treatment of Green by the Department of Corrections was evidence of complicity by some correctional officers in the attack on Addis.  Therefore, his claims of error and prejudice both fail.

### G.  Cumulative Error

Because we have found no error in the guilt phase, there is no cumulative prejudice to address.

59

## III. PENALTY PHASE CLAIMS

### A. Claims Related to Defendant's Convictions for Assault by a Life Prisoner with Malice Aforethought

#### 1. *Applicability of Section 4500 to Defendant at the Time of the Offenses*

Defendant contends his two convictions of assault by a life prisoner with malice aforethought must be reversed because he was not "undergoing a life sentence" (§ 4500) at the time he assaulted Addis (count 2) and Matthews (count 3). Citing section 1170.1, which addresses when a consecutive term imposed for a felony committed in prison commences, defendant claims that at the time he committed the assaults, he was still serving a sentence for burglary, and his life sentence had not yet begun. He contends that his state and federal constitutional rights to due process, trial by jury, and a reliable penalty determination require reversal of his convictions. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, subd. (a), 15, 16, 17.)

Preliminarily, the People assert that defendant has forfeited this claim because he failed to make the argument below and, indeed, did not contest evidence presented by the prosecution in the form of prison records to prove he was a life prisoner at the time of the offenses. Defendant casts his claim as one of sufficiency of the evidence to support his convictions, and on that basis, maintains that such a claim may be raised for the first time on appeal. (See *People v. Butler* (2003) 31 Cal.4th 1119, 1126 [substantial evidence claim can be raised on appeal even if it was not argued at trial].) Assuming, without deciding, that the claim is properly raised, it is without merit.

Section 4500 states in pertinent part: "Every person *while undergoing a life sentence*, who is sentenced to state prison within this state, and who, with malice aforethought, commits an assault upon the person of another with a deadly weapon

or instrument, or by any means of force likely to produce great bodily injury is punishable with death or life imprisonment without possibility of parole" if the victim dies. (Italics added.) Section 1170.1, subdivision (c) (hereinafter section 1170.1(c)) addresses when such a sentence commences if it is consecutive to a term already being served. It provides that when "any person [is] convicted of one or more felonies committed while the person is confined in the state prison . . . and the law either requires the terms to be served consecutively or the court imposes consecutive terms, the term of imprisonment for all the convictions that the person is required to serve consecutively *shall commence from the time the person would otherwise have been released from prison.*" (§ 1170.1(c), italics added.)

Here the evidence shows the following: In June 1992, defendant was sentenced to an eight-year prison term after he pleaded guilty to first degree burglary. The Department of Corrections calculated his earliest release date for this offense would be February 10, 2000. In September 1995, while still serving his burglary sentence, defendant pleaded guilty to possession of a deadly weapon by an inmate (§ 4502) which, because it was his third strike, resulted in a sentence of 25 years to life with the possibility of parole, consecutive to his burglary sentence. In defendant's chronological history log maintained by the Department of Corrections, an entry dated November 13, 1995, states: "Life term begins 2/10/2000." Defendant's assaults on Addis and Matthews were committed in 1997.

Based on this record, defendant contends he was not "undergoing a life sentence" when he assaulted his fellow inmates in 1997; rather, he was still serving his burglary sentence. We rejected a similar argument in *People v. McNabb* (1935) 3 Cal.2d 441 (*McNabb*), which involved section 4500's predecessor, former section 246. While McNabb was on parole for two robberies for which he had been sentenced to two determinate sentences, he committed two

61

more robberies, for which he was sentenced to two terms of five years to life. Upon his conviction for these later robberies, his parole was revoked and he was required to serve the rest of the two determinate sentences. Thereafter, while trying to escape from prison, he killed a fellow inmate. McNabb was tried and sentenced to death under former section 246, which provided: " 'Every person undergoing a life sentence in a state prison of this state, who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury, is punishable with death.' " *(McNabb,* at p. 444.)

On appeal, McNabb contended that he was not serving a life sentence when he attempted to escape because his life sentences for the later robberies, being consecutive to the determinate sentences for the earlier robberies on which his parole had been revoked, had not yet commenced. We rejected his argument: "The fact that appellant McNabb was returned to prison upon two convictions of first degree robberies committed while released on parole and was required to serve out the uncompleted terms of imprisonment by reason of breaking the terms of his parole did not suspend the force of commitments upon which he was held. Had he been discharged or released from serving the uncompleted terms by a writ of *habeas corpus* or by pardon he would have still been held as a prisoner serving a life term on said later commitments. We think the contention . . . to the effect that a person is not undergoing a life sentence within the purpose and meaning of the law, when imprisoned on a judgment which imposes the longest term known to the law and to which nothing further may be added, because, forsooth, he is also held on a prior uncompleted sentence for years does not stand the test of reason." (*McNabb, supra,* 3 Cal.2d at p. 457.)

We dismissed the defendant's reliance on former section 669, which provided that when a person was convicted of multiple crimes, the imprisonment

62

for each term was to "commence at the termination of the [preceding] term of imprisonment." (Former § 669, as amended by Stats. 1927, ch. 626, § 1, p. 1056.)[13] "Section 669 . . . is not germane to the subject. It has to do with time served in terms less than life. It does not purport to say that a person is not undergoing a life sentence when delivered on a certified copy of the judgment of conviction to the warden of the state prison. The prisoner is undergoing a life sentence whatever may happen and he is held as such a prisoner by virtue of said judgment." (*McNabb, supra,* 3 Cal.2d at p. 457.)

Finally, we pointed out that former section 246 "was enacted as a disciplinary regulation and as a means of protection to prisoners themselves against the assaults of the vicious, and also to protect the officers who are required to mingle with the inmates, unarmed. . . . It is applicable to the facts of [McNabb's] case in every sense." (*McNabb, supra,* 3 Cal.2d at p. 458.)

In reliance on our decision in *McNabb*, the Court of Appeal in *People v. Superior Court (Bell)* (2002) 99 Cal.App.4th 1334 (*Bell*), rejected a claim that a defendant's attack on another inmate did not occur while he was "undergoing a life sentence" (§ 4500) because he was serving a determinate term at the time of the attack. The court noted that the phrase "undergoing a life sentence" has remained constant from the enactment of former section 246 through various

---

**13**    In 1929, when McNabb was convicted of the two later robberies, former section 669 provided: "When any person is convicted of two or more crimes the former imprisonment to which he is sentenced upon the second or other subsequent conviction must commence at the termination of the first term of imprisonment to which he shall be adjudged, or at the termination of the second or other subsequent term of imprisonment, as the case may be; *provided*, that in exceptional cases the judgment, in the discretion of the court, may direct that such terms of imprisonment, or any of them, shall run concurrently." (Stats. 1927, ch. 626, § 1, p. 1056.)

amendments to section 4500, and the Legislature's intent has also remained the same — protecting guards and other prisoners from inmates who think they have " 'nothing left to lose' " by committing crimes in prison. (*Bell, supra*, 99 Cal.App.4th at p. 1341; see *id*. at pp. 1340-1341, citing *McNabb, supra*, 13 Cal.2d 441.) *Bell* further observed that in *In re Cowen* (1946) 27 Cal.2d 637, we explained that former section 669, which required that judgments provide whether multiple terms shall be served concurrently or consecutively, does " 'not . . . require that for all purposes, when consecutive sentences are directed, the defendant shall be regarded as imprisoned on only one charge at a time.' " (*Bell,* at p. 1343, quoting *Cowen*, at p. 648.) *Bell* acknowledged that former section 669 was amended after *In re Cowen* was decided, but concluded that "[a]ccording to the plain language of section 669, the mandate that a determinate sentence be served before a consecutive life sentence is for the purpose of calculating parole eligibility, and not for the purpose of determining whether the prisoner is undergoing a life sentence within the meaning of section 4500." (*Bell,* at p. 1343.)

Defendant attempts to distinguish *McNabb* and *Bell* on the basis that this case is governed by section 1170.1(c), which specifically addresses consecutive sentences with respect to crimes committed while in prison, rather than section 669, which more generally addresses concurrent and consecutive sentences. As noted above, section 1170.1 provides that when an individual is convicted of felonies in prison and consecutive sentences are imposed, "the term of imprisonment for all [such] convictions . . . shall commence from the time the person would otherwise have been released from prison." (§ 1170.1(c).) Based on this language, defendant reasons that his life term under the Three Strikes law for possession of a weapon in prison would not have begun until the earliest date on which he could have been released with respect to his determinate term for the

burglaries that led to his imprisonment. He contends that date would have been February 10, 2000, more than two years after he assaulted Addis.

Defendant's argument is unpersuasive for at least two reasons. First, it ignores the different language and functions of the two statutes. Section 1170.1(c) addresses when an inmate begins "to serve" consecutive sentences, whereas section 4500 addresses the punishment to be imposed for specified assaults committed "while undergoing a life sentence." Section 1170.1, like section 669, is a technical sentencing statute that addresses the time during which an inmate is actually serving a particular prison term, and does not purport to have any bearing on the question of whether an individual is undergoing a life sentence for purposes of section 4500. Furthermore, we presume that in enacting section 1170.1(c), the Legislature was aware of not only section 4500, but also the case law broadly interpreting the phrase "undergoing a life sentence" in that statute. Had the Legislature intended for section 1170.1(c) to modify in any way the latter statute, it could have said so.

Second, defendant's argument would undermine the shared purpose of sections 1170.1(c) and 4500 — deterring inmates from committing crimes in prison. "Section 1170.1(c) applies to felonies committed when the defendant is confined in a state prison. The statutory scheme makes clear that such felonies, i.e., those felonies committed in prison, are exempt from the general sentencing scheme." (*People v. White* (1988) 202 Cal.App.3d 862, 869.) The reason such felonies are treated differently is that "[t]he Legislature wanted in-prison crimes to be punished more severely than crimes committed 'on the 'outside.' " (*Ibid*.) It would be inconsistent with the legislative purpose of these statutes to construe section 1170.1(c) to preclude the application of section 4500 to inmates who have not yet begun serving an imposed and pending life sentence because they are still serving a determinate sentence.

65

Finally, defendant contends that because his Three Strikes conviction could have been overturned on appeal before he began to serve it, he was not a person undergoing a life sentence when he assaulted Addis. Of course, any life sentence consecutive to a determinate sentence could potentially be modified by commutation, pardon, a statutory change, an ultimately successful appeal or habeas corpus petition, or even avoided by the death of the inmate during the determinant term. Such speculative outcomes do not undermine the core reasoning of *McNabb* and *Bell* that the phrase "undergoing a life sentence" was intended to encompass an inmate who is subject to such a sentence, even if he or she has not begun "serving" that sentence.

### 2. *Whether Section 4500 Sufficiently Narrows the Class of Individuals Eligible for the Death Penalty*

Defendant contends that section 4500 fails to sufficiently narrow the class of individuals eligible for the death penalty in violation of his rights to a due process, and a fair trial, and the proscription against cruel and unusual punishment. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const. art. I, §§ 7, subd. (a), 15, 16, 17.) We disagree.

Under section 4500, a person undergoing a life sentence is eligible for a death sentence if found guilty of an assault with a deadly weapon or with force likely to produce great bodily injury, with malice aforethought, leading to the death of the victim. In effect, it authorizes imposition of the death penalty for what could be a second degree murder, i.e., an unlawful killing with malice aforethought. In contrast, the vast majority of offenses eligible for the death penalty are various forms of first degree murder. (§ 190.2.) Nonetheless, as discussed below, the legislative determination that life prisoners who commit fatal aggravated assaults are potentially deserving of death is a venerable one; versions of this statute have existed for more than a century. (See former § 246, added by

66

Stats. 1901, ch. 12, § 1, p. 6.)  Moreover, the statute is based on rationales involving security and deterrence in prison settings (see *McNabb, supra,* 3 Cal.2d at p. 457; *Bell, supra*, 99 Cal.App.4th at pp. 1339-1340), and California is scarcely alone in recognizing that killings committed by life prisoners in prison constitute a special class of homicide as to which the severest penalty should potentially apply.

Section 4500 is a death eligibility statute as opposed to a death selection statute.  (See *Tuilaepa v. California* (1994) 512 U.S. 967, 971-972.)  A defendant convicted of the offense defined by section 4500 becomes eligible for the death penalty or its alternative, life without the possibility of parole.  Thereafter, the jury selects the penalty following a penalty phase trial at which it considers evidence in aggravation and mitigation under section 190.3.  The selection process requires an " '*individualized* determination' " of the appropriate penalty based on " 'the character of the individual and the circumstances of the crime.' " (*Tuilaepa*, at p. 972.)  This "requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." (*Ibid.*)  The requirement of an individualized determination does not, however, apply to the eligibility stage.  (*Id.* at p. 973.)

The distinction between the eligibility and selection phases is significant in terms of the "differing constitutional treatment [the United States Supreme Court has] accorded those two aspects of capital sentencing.  It is in regard to the eligibility phase that [the court has] stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition.  In contrast, in the selection phase, [the court has] emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination." (*Buchanan v. Angelone* (1998) 522 U.S. 269, 275-276.)

67

"To pass constitutional muster, a capital sentencing scheme [1] must 'genuinely narrow the class of persons eligible for the death penalty and [2] must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " (*Lowenfield v. Phelps* (1988) 484 U.S. 231, 244.)  With respect to the first requirement, we note that the class of individuals potentially subject to the death penalty under section 4500 is quite circumscribed:  persons serving a life sentence who, with malice aforethought, assault another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury, resulting in the death of the victim within a year and a day.  (See *Woodson v. North Carolina* (1976) 428 U.S. 280, 287, fn. 7 [describing as "an extremely narrow category of homicide" "murder [committed] by a prisoner serving a life sentence"].)  The statute easily satisfies the requirement that an eligibility factor "apply only to a subclass of defendants convicted of [homicide]." (*Tuilaepa v. California, supra,* 512 U.S. at p. 972.)

With respect to the second requirement — reasonable justification for a more severe sentence — we reiterate that the Legislature has determined that death eligibility for life prisoners who commit an aggravated assault that leads to the victim's death is required to "protect[] [their fellow] prisoners . . . against the assaults of the vicious, and also to protect the officers who are required to mingle with the inmates, unarmed." (*McNabb, supra,* 3 Cal.2d at p. 458; accord, *Bell, supra*, 99 Cal.App.4th at p. 1341.)  By imposing more severe penalties on those serving life sentences, "the Legislature was attempting to deter severely violent crime by those who might otherwise think themselves immune from punishment because they were already lifetime guests of the state penal system." (*In re Carmichael* (1982) 132 Cal.App.3d 542, 546.)  Along with retribution, deterring attacks by life prisoners and thereby promoting the safety of inmates and correction officers are legitimate penal objectives.  (See *Kennedy v. Louisiana*

(2008) 554 U.S. 407, 420 (*Kennedy*) ["punishment is justified under one or more of three principal rationales:  rehabilitation, deterrence, and retribution"].)  These rationales of institutional security, deterrence, and retribution provide a reasonable justification for distinguishing this category of murder from others to which the death penalty does not apply.

Defendant contends section 4500 fails to sufficiently narrow the subclass of defendants eligible for the death penalty because it does not distinguish between different types of life prisoners, such as those serving a life term for murder and someone like him whose life sentence was imposed under the Three Strikes law for nonviolent felonies.[14]  There is no requirement at the eligibility stage that a narrowly circumscribed class of defendants for whom the death penalty is reasonably justified be further distinguished according to the particular circumstances that led to their eligibility.  Rather, that is a question that goes to the selection stage and its individualized determination requirement.  Only at that point does the Eighth Amendment require "a broad inquiry into all relevant mitigating evidence to allow an individualized determination." (*Buchanan v. Angelone, supra,* 522 U.S. at p. 276.)  Although the reason why a defendant was a life prisoner at the time of the violation of section 4500 may be a relevant consideration for the jury at the selection stage, that reason is irrelevant to the justification for including such persons in the death-eligible class; the reasons underlying section 4500 apply with equal force to life prisoners who have

---

[14]    Defendant's life sentence was imposed as a result of his 1995 guilty plea to a third strike of possession of a weapon in prison (§ 4502) and his admission to two prior felony convictions for burglary.

69

committed prior violent crimes and those who face lifetime imprisonment for nonviolent offenses.[15]

Defendant next argues that "[d]evelopments since [prior] decisions upholding [earlier versions of] section 4500 and its predecessor statutes have undermined the retribution, deterrence and safety rationales offered to justify death eligibility on life prisoner status." In essence, defendant's claim is that, because prior versions of section 4500 would not pass constitutional muster in light of evolving Eighth Amendment jurisprudence, the underlying legislative justifications for punishing life prisoners who, with malice aforethought, commit fatal assaults in prison have also been eroded over time. As explained below, the argument fails because the legislative justifications remain valid.

Until 1977, section 4500 and its predecessor, former section 246, mandated the death penalty for life prisoners who committed an aggravated assault, regardless of whether the victim died. The original statute, enacted in 1901, provided: "Every person undergoing a life sentence in a state prison of this state, who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury, is punishable with death." (Stats. 1901, ch. 12, § 1, p. 6.) In

---

**15** Defendant's reliance on *Tuilaepa v.California, supra,* 512 U.S. 967, is misplaced. As he concedes, *Tuilaepa* concerns death selection, not death eligibility. Moreover, *Tuilaepa*'s observation that some *sentencing* factors may be unconstitutionally vague if they lack "some 'common-sense core of meaning . . . that criminal juries should be capable of understanding' " (*id.* at p. 975) does not support defendant's assertion that section 4500 is unconstitutionally vague. As *Tuilaepa* itself notes, "[t]he eligibility decision fits the crime within a defined classification." (*Id.* at p. 973.) Section 4500 meets this standard. Similarly, *Godfrey v. Georgia* (1980) 446 U.S. 420, also cited by defendant, involved a vagueness challenge to a sentencing factor. (*Id.* at pp. 422-423.)

1941, section 246 was repealed and reenacted, renumbered as section 4500, but textually remained substantially the same. (Stats. 1941, ch. 106, §§ 1, 15, pp. 1080, 1124.) In 1977, following the restoration of the death penalty in California (see *People v. Frierson* (1979) 25 Cal.3d 142, 172-175), section 4500 was amended to its present form. The amendment eliminated the mandatory death penalty provision and limited eligibility for the death penalty to aggravated assaults with malice aforethought resulting in death, with the alternative of life without the possibility of parole. (Stats. 1977, ch. 316, § 21, p. 1264.)

Defendant cites a number of decisions by this court upholding those earlier and now superseded versions of the statute against various constitutional challenges (see, e.g., *People v. Vaughn* (1969) 71 Cal.2d 406, 418 [imposition of death penalty under section 4500 for an assault that did not result in the death of the victim did not violate the Eighth Amendment's proscription against cruel and unusual punishment]; *People v. Wells* (1949) 33 Cal.2d 330, 337 [holding that mandatory death penalty imposed under section 4500 on prisoner serving an indeterminate sentence "infringes no constitutional limitation"]; *People v. Finley* (1908) 153 Cal. 59 [upholding mandatory death penalty imposed on a life term defendant convicted under former section 246 against an equal protection challenge to the statute]), and asserts that none of these earlier decisions would survive scrutiny under current Eighth Amendment jurisprudence because the Eighth Amendment now prohibits the death penalty for nonfatal assaultive crimes, and also prohibits mandatory death penalty statutes. (See, e.g., *Kennedy, supra,* 554 U.S. 407 [striking down a statute authorizing the death penalty for rape of a child]; *Woodson v. North Carolina, supra*, 428 U.S. 280 [striking down statute making the death penalty mandatory for first degree murder]; *Graham v. Superior Court* (1979) 98 Cal.App.3d 880 [declaring unconstitutional a 1973 version of section 4500 that contained a mandatory death penalty provision].) From this

71

premise, he contends that the legislative justifications offered in support of the statute in our earlier opinions — deterrence, retribution, and institutional security — have been eroded and are now constitutionally suspect.

Defendant's logic is flawed and the cases on which he relies are inapposite. Decisions rejecting constitutional challenges to prior versions of the statute containing elements that would no longer be constitutionally permissible are obviously not controlling in our examination of the current version of the statute. Nonetheless, the discussions in those earlier decisions of the threats of violence posed by prisoners sentenced to life terms as justification for the *policy* of potentially imposing the death penalty on them remain valid and support the current version of section 4500.**16** The United States Supreme Court continues to recognize that penal statutes may legitimately rest on one or more of "three principal rationales:  rehabilitation, deterrence, and retribution" (*Kennedy, supra,* 554 U.S. at p. 420.)  Section 4500, as already noted, singles out a particular subclass of defendants who commit lethal assaults with malice aforethought — those imprisoned for life — and makes them eligible for the death penalty because the Legislature has determined their particular status as life prisoners requires this exceptional measure to protect correctional officers and other inmates.  With the

---

**16**    For example, in *People v. Finley, supra*, 153 Cal. at page 61, this court observed that "it has long been a part of judicial knowledge, of legislative knowledge, and, indeed, of general knowledge, that convicts in penal institutions undergoing sentences for life, constitute a most reckless and dangerous class.  The conditions of their sentences destroy their hopes and with the destruction of hope all bonds of restraint are broken and there follows a recklessness leading to brutal crimes. . . .  They were crimes of violence committed not alone against fellow inmates, but upon the custodians, officers, and guards of the institutions. . . . Under this well-recognized condition of affairs it seemed expedient to the legislature to meet the situation by the enactment of section 246 of the Penal Code."

72

growth in the prison population and prison gangs, this rationale applies with equal or greater force today compared to when it was first articulated over a hundred years ago. Accordingly, we reject defendant's assertion that the statute's rationale has been superseded or undermined merely because earlier versions of the statute would no longer pass constitutional muster.

The opinion upon which defendant places primary reliance, *Sumner v. Shuman* (1987) 483 U.S. 66, is inapposite. In *Sumner*, the United States Supreme Court declared unconstitutional a Nevada statute that *mandated* the death penalty for prisoners who committed murder while undergoing a sentence of life without the possibility of parole. Under Nevada law, life without the possibility of parole could be imposed for crimes other than murder, such as kidnapping, rape and battery with substantial bodily harm. (*Id.* at pp. 80-81.) The Supreme Court noted that under those circumstances, "[w]ithout consideration of the nature of the predicate life-term offense and the circumstances surrounding the commission of that offense, the label 'life-term inmate' reveals little about the inmate's record or character." (*Id.* at p. 81.) The court further noted that "a guided-discretion sentencing procedure does not undermine any deterrent effect that the threat of the death penalty may have" (*id.* at p. 83), and that a guided-discretion procedure does not necessarily allow an inmate to avoid retribution (*id.* at pp. 83-84). The court did not, however, question the legitimacy of deterrence and retribution as rationales. In short, the statute in *Sumner* differs from section 4500 in crucial respects, and defendant's reliance on *Sumner* is misplaced.

Defendant also cites two studies assertedly demonstrating that the death penalty has an insignificant deterrent effect on prison murders.[17] The weight and

---

[17] Defendant cites Sorensen & Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants* (2000) 90 J. Crim. L. &

*(footnote continued on next page)*

validity of such studies involve policy questions within the Legislature's purview. So, too, do defendant's arguments regarding retributive steps short of death that might be taken against prisoners who kill. These studies do not establish that imposing death eligibility on life prisoners who commit fatal aggravated assaults is constitutionally impermissible.

Next, defendant contends that an "interjurisdictional comparison demonstrates a lack of societal consensus that a murder by a life prisoner" deserves the death penalty. We are not persuaded.

In evaluating whether there was a consensus against making the crime of rape of a child punishable by death, the United States Supreme Court examined both "[t]he history of the death penalty for the crime of rape" and the current status of such statutes in the United States. (*Kennedy, supra,* 554 U.S. at p. 422.) The court traced an historical movement away from imposing the death penalty for rape from its high point in 1925 when 18 states, the District of Columbia and the federal government had such statutes, to the post-*Furman* (*Furman v. Georgia* (1972) 408 U.S. 238) landscape, when only Louisiana and five other states had reenacted such statutes. The court further noted that the statutes of four of those states were more restrictive than Louisiana's law, because they required a prior conviction for rape as a condition for death eligibility while the remaining state, Georgia, required aggravating circumstances including, but not limited to, a prior conviction. (*Kennedy, supra,* 554 U.S. at p. 423.) "By contrast, 44 States have not made child rape a capital offense. As for federal law, Congress in the Federal

---

*(footnote continued from previous page)*

Criminology 1251, and Marquart & Sorensen, *A National Study of the Furman-Commuted Inmates: Assessing the Threat to Society from Capital Offenders* (1989) 23 Loyola L.A. L.Rev. 5.

Death Penalty Act of 1994 expanded the number of federal crimes for which the death penalty is a permissible sentence, including certain nonhomicide offenses; but it did not do the same for child rape or abuse. [Citation.] Under 18 U.S.C. § 2245, an offender is death eligible only when the sexual abuse or exploitation results in the victim's death." (*Ibid.*)

The court drew comparisons between these statistics and those it had examined in three earlier cases in which it had held the death penalty unconstitutional when imposed upon certain types of aiders and abettors to felony murder (*Enmund v. Florida* (1982) 458 U.S. 782), the intellectually disabled (*Atkins v. Virginia*, *supra*, 536 U.S. 304), and juveniles (*Roper v. Simmons* (2005) 543 U.S. 551). (*Kennedy*, *supra*, 554 U.S. at pp. 425-426.) As in those cases, the court's survey led it to conclude that the "evidence of a national consensus with respect to the death penalty for child rapists . . . shows divided opinion but, on balance, an opinion against it." (*Id.* at p. 426.) The court concluded: "After reviewing the authorities informed by contemporary norms, including the history of the death penalty for this and other nonhomicide crimes, current state statutes and new enactments, and the number of executions since 1964, we conclude there is a national consensus against capital punishment for the crime of child rape." (*Id.* at p. 434.)

As an initial matter, it is significant that the court in *Kennedy* explicitly and repeatedly referred to the fact that the statute at issue authorized the death penalty for a crime that, while still devastating for the victim, did not result in the victim's death. (See, e.g., *Kennedy*, *supra*, 554 U.S. at p. 435 [acknowledging that "there are moral grounds to question a rule barring capital punishment for a crime against an individual that did not result in death"]; *id.* at p. 437 ["the death penalty should not be expanded to instances where the victim's life was not taken"]; *id.* at p. 439 [recognizing the possibility of arbitrary results in cases of heinous crimes that may

75

"overwhelm a decent person's judgment" and refusing to "sanction this result when the harm to the victim, though grave, cannot be quantified in the same way as death of the victim"].)  Of course, for a violation of section 4500 to be death eligible, the victim must die (within a year and a day) from the assault. Accordingly, a major aspect of the court's reasoning in *Kennedy* does not apply here.

Defendant nonetheless contends that there is no "societal consensus" to support imposition of death for a life prisoner who kills.  In support of his claim, he cites the high court's decisions in *Kennedy, Roper, Atkins,* and *Enmund*, but his analysis bears only a superficial resemblance to those opinions' rigorous examination of historical, judicial, and legislative trends regarding the existence of an evolving national consensus against authorization of imposition of the death penalty on a class of defendants.  Instead, he rests his argument solely on his assertion that 75 percent of American jurisdictions have rejected using prisoner status to determine death eligibility.  His statistical reading is tendentious.  In fact, based on his statistics, it is more accurate to say that the vast majority of jurisdictions with the death penalty regard custody status as a significant factor in either death penalty eligibility or death penalty selection, or for both purposes.  Of the 31 states and the federal government whose laws currently authorize imposition of the death penalty, the laws of 29 states and the federal government use custody status as a death-eligibility or a death-selection factor, or both.  It appears that only Nebraska and South Carolina do not explicitly include custodial status as a death-eligibility or selection factor.

Defendant does not cite, nor has our research found, a single judicial decision from any death penalty jurisdiction that has held that the use of custodial status as either an eligibility or a selection factor for the death penalty violates the Eighth Amendment.  Nor has defendant shown that any jurisdiction that reenacted

76

the death penalty following *Furman v. Georgia*, *supra*, 408 U.S. 238, omitted custodial status as either an eligibility or selection factor for purposes of the death penalty. Thus, defendant fails to demonstrate the existence of an historical trajectory supporting a conclusion that the majority, or, indeed, any, of the death penalty jurisdictions has abandoned custody status as a factor for imposing the death penalty.

Instead, defendant attempts to parse the statistical evidence to argue that we should look only at states whose statutes mirror section 4500, that is, statutes that use life term status as an eligibility factor and apply the death penalty to killings that do not rise to the level of first degree murder. Using this metric, defendant concludes that only eight states have a law comparable to section 4500.

However, the question here is *whether* custodial status is used by a majority of jurisdictions as a basis for potentially imposing the death penalty, not *how* individual jurisdictions use that factor. In other words, is there a consensus that the death penalty is *not* an appropriate punishment for a fatal aggravated assault by a life prisoner? Moreover, in this case, where defendant was also convicted of first degree murder, he would have faced the death penalty in *every* jurisdiction that uses custodial status as either an eligibility or selection factor. Even granting that only a few states have statutes mirroring section 4500, this number is meaningless without a rigorous analysis of the type undertaken by the United States Supreme Court, which examines not simply numbers, but statutory history and relevant judicial and legislative actions, to answer the national consensus question. Defendant provides none of that, and as mentioned, we have uncovered nothing that suggests a majority of the country rejects the death penalty in circumstances covered by section 4500.

Finally, defendant asserts the status of life prisoner is overbroad because it does not further distinguish between those inmates whose life sentence was the

77

result of a violent crime and those, like himself, whose life sentence is premised on a Third Strike as to which the predicate crimes were nonviolent felonies.

As noted earlier, however prisoners subject to life sentences came to hold that status, they are a small and distinct subclass of those who commit homicides punishable as murder. Additionally, the rationale for making such defendants death eligible — to deter and punish crimes by individuals acting under the belief they have nothing left to lose — applies to all life prisoners regardless of the reason for their life sentences. Furthermore, to the extent the reasons for a defendant's life sentence might mitigate his or her punishment, that is an issue that can be raised at the penalty phase.

For these reasons, we reject defendant's constitutional challenge to section 4500's death eligibility provision.

### B. Prosecutorial Discretion in Seeking Death Penalty

Defendant contends that prosecutorial discretion in seeking the death penalty violates his federal and state constitutional rights to due process and equal protection, and constitutes "the arbitrary and capricious enforcement of the death penalty." (U.S. Const., 5th, 8th & 14th Amends.; Cal. Const., art. I, § 7, subd, (a).)

We have consistently held that "prosecutorial discretion to select those eligible cases in which the death penalty actually will be sought does not, in and of itself, evidence an arbitrary and capricious capital punishment system, nor does such discretion transgress the principles underlying due process of law, equal protection of the laws, or the prohibition against cruel and unusual punishment." (*People v. Crittenden* (1994) 9 Cal.4th 83, 152.) As we explained in an early decision addressing the issue: "Many circumstances may affect the litigation of a case chargeable under the death penalty law. These include factual nuances,

strength of evidence, and, in particular, the broad discretion to show leniency. Hence, one sentenced to death under a properly channeled death penalty scheme cannot prove a constitutional violation by showing that other persons whose crimes were superficially similar did not receive the death penalty.  [Citations.] The same reasoning applies to the prosecutor's decisions to pursue or withhold capital charges at the outset."  (*People v. Keenan* (1988) 46 Cal.3d 478, 506.)  In subsequent cases, we rejected the argument that we should reexamine this holding in light of the high court's voting rights decision in *Bush v. Gore* (2000) 531 U.S. 98.  (*People v. Bennett* (2009) 45 Cal.4th 577, 629, fn. 19.)  We continue to adhere to that holding.  (See, e.g., *People v. Bryan, Smith and Wheeler* (2014) 60 Cal.4th 335, 469; *People v. Scott* (2011) 52 Cal.4th 452, 495; *People v. Gamache* (2010) 48 Cal.4th 347, 406.)  Nothing in defendant's arguments persuades us that our earlier rulings were incorrect.  Furthermore, the reasoning of those cases applies with equal force to the exercise of prosecutorial discretion to seek the death penalty under section 4500.

### C.  Admission of Evidence of Defendant's Criminal History

Defendant contends the trial court abused its discretion when it allowed the prosecutor to elicit from a defense expert on cross-examination details of defendant's theft-related prior offenses and juvenile adjudications.  He contends the ruling also violated his federal and state constitutional rights to due process, a fair trial, trial by jury, and a reliable penalty determination.  (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, subd. (a). 15, 16, 17.)  The claim is meritless.

#### 1.  Background

James Cuevas testified for the defense in his capacity as a casework specialist for the California Youth Authority (CYA), now known as the California

Division of Juvenile Justice, a position he likened to that of a social worker. Cuevas described his function as providing "diagnostic evaluations for the court" and the CYA. Although not a psychologist, his academic credentials included courses in psychology and "some basic understanding of various mental health issues." His formal degree was a masters in social work.

In 1987, defendant, then 19 years old, pleaded guilty to two counts of burglary and one count of grand theft auto. Although an adult, the court referred defendant to the CYA in lieu of state prison under a statute that allowed the transfer of individuals under 21 to the CYA. Cuevas led the team that assessed defendant to determine "a treatment plan and also potential placement for his benefit." This assessment was memorialized in a 97-page document labeled Daniel Landry Mental Health Records. On direct examination, Cuevas reviewed the report and testified generally to its observations and conclusions regarding defendant's mental health and treatment plan. For example, he testified about defendant's troubled family life, including the fact that his parents were both deaf and had emotional problems. He also stated that defendant reported he had been sexually molested on two occasions. He reviewed defendant's placements as a juvenile in institutions for juveniles with emotional problems, and he reported that defendant told him he had escaped from juvenile hall. Cuevas recounted that defendant seemed depressed and suicidal, and that he had recommended that defendant receive intensive individual therapy as well as group therapy and be enrolled in educational and vocational programs.

Over defendant's objection, and following an Evidence Code section 402 hearing, the trial court allowed the prosecutor to cross-examine Cuevas about the details of the three offenses for which defendant was referred to the CYA, as well as prior juvenile theft-related adjudications. At the evidentiary hearing, Cuevas stated that defendant's criminal history was "[e]xtremely important" to his

assessment of defendant and his recommendations as to treatment and placement. In addition, in response to a question from the court, he explained that the specific details of a prior offense were relevant to a treatment plan "because we may send him to a placement program . . . that will deal with individuals with that particular problem. . . . So we look at the pattern of behavior."

On cross-examination, Cuevas again stated that a person's criminal history was very important to his assessment and recommendations because it factored into the decision about placement and treatment. He explained that defendant's history of "thievery" demonstrated he was "a chronic, habitual offender," for whom earlier attempts at intervention had failed. He testified that, as a juvenile, defendant had been provided with various opportunities for rehabilitation after juvenile petitions charging theft-related offenses had been sustained against him. Cuevas explained that defendant's prior criminal history and prior placements were relevant to his future placement because it "sort of, you know, curtails the type of . . . trust we can . . . provide for him . . . within the facility." The prosecutor then led Cuevas through defendant's current and prior convictions and juvenile adjudications in detail. This testimony addressed sustained juvenile petitions for burglary when defendant was 15 years old and when he was 16 years old, as well as details of his then-current offenses. Based on that history, Cuevas concluded that defendant was a "chronic habitual offender." In light of this, Cuevas had recommended that defendant be placed in a "closed, locked setting" at which he would "be supervised every minute of his life."

   2. *Discussion*

Defendant contends the trial court abused its discretion when it allowed the prosecutor to cross-examine Cuevas about the details of defendant's prior theft-related convictions and juvenile adjudications, because they did not involve the

81

use or attempted use or threat of violence and were thus inadmissible as a factor in aggravation under section 190.3, factor (b).  He contends further that the testimony was irrelevant because the details of defendant's criminal history were "not important to [Cuevas's] clinical impressions and his long-range custodial plans."[18]

Regarding defendant's first argument, the evidence of his theft-related criminal history was not presented by the prosecution pursuant to section 190.3, factor (b) but was, instead, proper rebuttal to the defense case in mitigation.  "Rebuttal evidence is relevant and admissible if it tends to disprove a fact of consequence on which the defendant has introduced evidence. . . .  The trial court has broad discretion to determine the admissibility of rebuttal evidence and, absent palpable abuse, an appellate court may not disturb the trial court's exercise of that discretion."  (*People v. Valdez* (2012) 55 Cal.4th 82, 169; see *People v. Mitcham* (1992) 1 Cal.4th 1027, 1072-1073 [evidence of the defendant's juvenile adjudications were admissible to rebut evidence of his good character and, as such, was "not subject to the notice requirement of section 190.3 and need not relate to any specific aggravating factor under section 190.3"].)

We also reject defendant's contention that the evidence of his criminal record was irrelevant because it was not an important part of Cuevas's assessment and treatment plan for defendant.  Cuevas himself repeatedly testified that defendant's prior record was an important aspect of his assessment and

---

**18**    Additionally, he argues that defendant's juvenile adjudications were inadmissible as prior convictions under *Apprendi v. New Jersey* (2000) 530 U.S. 466 and its progeny.  His reply brief acknowledges this argument is foreclosed by our decision in *People v. Nguyen* (2009) 46 Cal.4th 1007, but he urges us to reconsider it.  We decline to do so.

recommendations, giving as an example how defendant's prior record of thievery would have affected the degree of security and supervision he would require.

More generally, the evidence was relevant to rebut the sympathetic portrait defendant was attempting to paint of himself for the jury. The defense called Cuevas to further its overall depiction of defendant as the victim of a grossly abusive family who, as a result, suffered from severe emotional and psychological problems that mitigated his current offense. The defense sought to do so by selectively questioning Cuevas about his evaluation of defendant, focusing on his chaotic family background and depressed mental state. The prosecution was entitled to rebut this characterization that defendant was a victim by demonstrating that Cuevas's assessment also included his view that defendant was a habitual chronic offender who had failed in previous attempts at rehabilitation.[19] Thus, the trial court did not abuse its discretion in permitting the prosecution to question Cuevas about defendant's prior criminal record in order "to present a more balanced picture of the defendant's personality." (*People v. Valdez, supra,* 55 Cal.4th at p. 170.)

---

[19] Defendant quotes a sentence from *In re Lucas* (2004) 33 Cal.4th 682, in which we said, "Evidence that a defendant suffered abuse in childhood generally does not open the door to evidence of defendant's prior crimes or other misconduct." (*Id.* at p. 733.) In *Lucas,* we granted the defendant's petition for a writ of habeas corpus based on his claim that his trial attorney was constitutionally ineffective for failing to investigate or present mitigating evidence of abuse he suffered as a child. The sentence defendant quotes was in connection with our discussion regarding prejudice and our comment that the respondent had not offered any theory under which evidence of the abuse defendant suffered as a child would, in and of itself, have opened the door to rebuttal evidence. (*Ibid.*) That observation has no bearing on the present case, which is distinguishable both legally and factually.

**D. Admission of Razor Blade Evidence**

Defendant contends the admission of evidence that he was in possession of a razor blade discovered in his cell during the penalty phase trial was an abuse of discretion and violated his federal and state constitutional rights to due process, a fair trial, trial by jury, and reliable capital sentencing proceedings. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, subd. (a), 15, 16, 17.) The contention is meritless.

In a search of defendant's cell during the penalty phrase trial, a razor blade was discovered on a table. Defendant was not permitted to possess razor blades. The prosecution sought to present evidence of this incident under section 190.3, factor (b), which allows evidence of criminal activity which "[i]nvolved the use or attempted use of force or violence or the express or implied threat to use force or violence." The prosecution argued that defendant's possession of the razor blade violated section 4502, subdivision (a), which prohibits possession, custody or control of a weapon, including "any dirk or dagger or sharp instrument" by a person confined in any penal institution. Over the defense's objection, the trial court admitted the evidence.

Defendant contends the trial court abused its discretion because there was no evidence he intended to use the razor blade to attack anyone and, therefore, his possession did not constitute the use or attempted use of or express or implied threat to use violence. We previously rejected this argument in *People v. Wallace* (2008) 44 Cal.4th 1032, in which the defendant similarly argued that simple possession of a razor blade, without evidence that he had threatened to use it, is not admissible under section 190.3, factor (b). "As we have previously explained, 'mere possession of a potentially dangerous weapon in custody involves an implied threat of violence . . . .' [Citation.] The circumstances of defendant's possession of the contraband, particularly when viewed together with his overall

84

conduct while in custody — which included five rules violations for fighting — lead us to conclude that the trial court did not abuse its discretion in admitting the evidence of defendant's razor possession under section 190.3, factor (b)." (*Wallace*, at p. 1082.)

As noted above, in this case, the prosecution introduced evidence that defendant had, on numerous occasions, possessed prison-made slashing instruments and had used them to attack fellow inmates. At least one of these weapons had been fashioned out of a razor blade. The trial court clearly did not act outside the bounds of reason in concluding defendant's possession of the razor blade discovered in his cell during the penalty phase trial could constitute evidence of a threat of violence. In these circumstances, the court acted well within its discretion when it admitted the razor blade evidence under section 190.3, factor (b).

### E. Admission of Criminal Activity Beyond the Statute of Limitations

Defendant contends the admission of 18 prior criminal incidents under section 190.3, factor (b) was barred by the statute of limitations. As he concedes, however, we have repeatedly rejected this argument. " '[N]either remoteness nor the expiration of the statutory limitations period bars admission of a defendant's prior unadjudicated criminal activity for purposes of section 190.3, factor (b).' " (*People v. Famalaro* (2011) 52 Cal.4th 1, 42, quoting *People v. Medina* (1995) 11 Cal.4th 694, 772.) Defendant's arguments do not persuade us that reconsideration of these decisions is warranted.

### F. Claims of Instructional Error

#### 1. Instruction on Defenses to Criminal Activity and Defendant's Mental Health Evidence

Defendant contends the trial court's failure to instruct the jury, on the court's own motion, to consider certain defenses to certain unadjudicated criminal

activity introduced by the prosecution under section 190.3, factor (b), after the court granted the prosecution's request to instruct on the elements of those offenses, violated his federal and state constitutional rights to due process, a fair trial, trial by jury, and reliable capital sentencing proceedings. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art I, §§ 7, subd. (a), 15, 16, 17.) Specifically, he contends the trial court should have instructed the jury that self-defense against the use of excessive force was a defense to an incident on October 21, 1994, during which defendant was forcibly extracted from his cell after refusing to return his food tray. Furthermore, he contends the trial court should have instructed the jury to consider the impact of his mental health issues on all factor (b) evidence. The claim is meritless.

Over the defense's objection, the trial court agreed to instruct the jury on the elements of the section 190.3, factor (b) offenses. The defense did not request any further instruction on these offenses and none was given.

Preliminarily, the People contend defendant has forfeited this claim because he assertedly had a tactical reason for not requesting additional instruction — he wanted to minimize the jury's focus on his criminal activity. "When defense counsel makes a ' "conscious, deliberate tactical choice" ' to request [or object to] an instruction, any error in the giving [or refusal to give] the instruction is invited and cannot be raised on appeal." (*People v. Catlin* (2001) 26 Cal.4th 81, 150.) However, defendant's objection was only to the prosecutor's request to instruct the jury on the elements of the offenses. This limited objection does not bar defendant's present claim, which relates to the trial court's further duty, once it agreed to give the elements instruction, to "instruct sua sponte on legally available defenses." (*People v. Montiel* (1993) 5 Cal.4th 877, 942.)

In prior decisions, we have assumed without deciding that when the trial court gives an instruction on the elements of section 190.3, factor (b) offenses,

those instructions should include any applicable defenses. (*People v. Montiel, supra*, 5 Cal.4th at p. 942; see, also, *People v. Cain* (1995) 10 Cal.4th 1, 72.) Nonetheless, the court is under no obligation to provide such instruction unless "such defenses are supported by substantial evidence." (*People v. Montiel,* at p. 942.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) Defendant fails to identify such evidence. He does no more than repeat his version of the circumstances under which correctional officers were forced to remove him from his cell after he refused to return his food tray and refused to come out peaceably. Thus, no self-defense instruction was warranted.

With respect to his claim that the trial court should have instructed the jury to consider evidence of his mental health problems as they bore on the section 190.3, factor (b) evidence, defendant fails to demonstrate how such evidence would have comprised a legal defense to any of those offenses. Rather, he contends that such evidence was a potentially mitigating factor and the jury should have been so instructed. Such instruction was given in the form of an instruction patterned on section 190.3, factor (k). The jury was told it could consider in mitigation "any sympathetic or any aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." Furthermore, in discussing the factor (b) evidence, defense counsel specifically argued that the evidence of defendant's mental health issues and the failure of correctional authorities to respond to his request for treatment "remarkabl[y] diminished the weight of [factor (b)] material." Accordingly, the jury was instructed it could consider this evidence, and defense counsel explicitly urged them to do so.

87

Defendant asserts, however, that the section 190.3, factor (k) instruction was insufficient to direct the jury to the particular issue of the effect of his mental illness as it related to the section 190.3, factor (b) evidence. That claim is forfeited by his failure to seek clarification or amplification of the instruction. (*People v. Lang* (1989) 49 Cal.3d 991, 1024 ["A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language"].)

### 2. CALJIC No. 8.87

Defendant contends CALJIC No. 8.87, which addresses evidence related to section 190.3, factor (b), is flawed because (1) it creates a mandatory presumption of violence and (2) it fails to require that jurors unanimously agree that defendant committed the factor (b) criminal activity.[20] We have previously rejected these challenges to the instruction. (*People v. Butler, supra*, 46 Cal.4th at pp. 871-872 [CALJIC No. 8.87 does not create a mandatory presumption]; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1181-1182 [unanimity not required].) Nothing in defendant's argument persuades us to revisit these conclusions.

---

[20] In pertinent part, the jury was instructed as follows: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts or activities . . . all of which involved the express or implied use of force or violence or the threat of force or violence. Before a juror may consider any criminal activity as an aggravating circumstance in this case, a juror must be satisfied beyond a reasonable doubt that the defendant . . . did in fact commit the criminal activity. A juror may not consider any evidence of any other criminal activity as an aggravating circumstance. [¶] It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that the criminal activity occurred, that juror may consider that activity as a fact in aggravation. If not so convinced, that juror must not consider that evidence for any purpose."

### 3. *Instruction Regarding Punishment of Accomplice*

Defendant contends the trial court erred by failing to instruct the jury to consider as a mitigating circumstance the punishment meted out to his accomplice, Gary Green. As defendant acknowledges, we have repeatedly rejected the claim that a court should instruct the jury that it may consider lenient treatment of an accomplice as a mitigating circumstance. " 'We have consistently held that evidence of an accomplice's sentence is irrelevant at the penalty phase because "it does not shed any light on the circumstances of the offense or the defendant's character, background, history or mental condition." ' " (*People v. Brown, supra*, 31 Cal.4th at p. 562; accord, *People v. Whalen* (2013) 56 Cal.4th 1, 85.) Similarly, we have rejected calls to reexamine our conclusion in light of *Parker v. Dugger* (1991) 498 U.S. 308, which defendant also cites. (*People v. Cain, supra*, 10 Cal.4th at p. 63 ["*Parker* did not hold evidence of an accomplice's sentence must be introduced in mitigation at the penalty phase, or that a comparison between sentences given codefendants is required"].) We adhere to these conclusions.

### 4. *Use of Restrictive Adjectives and Restrictive Timeframe in Instructions on Mitigating Factors*

Defendant contends the use of certain restrictive adjectives in CALJIC No. 8.85 pertaining to mitigating factors, such as "extreme" and "substantial," impose an unconstitutional threshold requirement before the jury may consider mitigating evidence. We have repeatedly rejected this argument (*People v. Cage* (2015) 62 Cal.4th 256, 296), and do so again. We have also consistently rejected defendant's related claim that language in section 190.3, factors (d) and (h) allowing consideration of defendant's mental or emotional state or intoxication *at the time of the offense* precludes the jury from considering such evidence when it

is not related to the offense (*People v. Combs* (2004) 34 Cal.4th 821, 867-868), and do so again.

### 5. CALJIC No. 8.88

Defendant makes familiar and oft-rejected challenges to CALJIC No. 8.88, which advises jurors regarding the scope of their discretion to reject death and return a verdict of life without the possibility of parole. We again conclude that the instruction is "not unconstitutional for failing to inform the jury that: (a) death must be the appropriate penalty, not just a warranted penalty [citation]; (b) [a sentence of life without the possibility of parole] is required, if it finds that the mitigating circumstances outweigh those in aggravation [citation] or that the aggravating circumstances do not outweigh those in mitigation [citation]; (c) [a sentence of life without the possibility of parole] may be imposed even if the aggravating circumstances outweigh those in mitigation [citation]; (d) neither party bears the burden of persuasion on the penalty determination [citation]. [¶] [Moreover,] section 190.3 and the pattern instructions are not constitutionally defective for failing to assign the state the burden of proving beyond a reasonable doubt that an aggravating factor exists, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate penalty. . . . The recent decisions of the United States Supreme Court interpreting the Sixth Amendment's jury trial guarantee do not compel a different result." (*People v. Bramit* (2009) 46 Cal.4th 1221, 1249-1250, fn. omitted.) Finally, the use of the phrase " ' "so substantial" ' " as a standard of comparison for mitigating and aggravating factors does not render the instruction unconstitutional. (*People v. Dykes* (2009) 46 Cal.4th 731, 814.)

## G. Constitutional Challenges to Death Penalty Statute

Defendant raises a number of challenges to the constitutionality of the death penalty statute, which, as he acknowledges, we have previously and consistently rejected. His arguments fail to persuade us to reconsider our prior decisions and, therefore, we again reject the contentions that the statute is unconstitutional because it (1) fails to require the jury to find the existence of aggravating factors beyond a reasonable doubt (*People v. Cage, supra,* 62 Cal.4th at p. 296); (2) does not require written findings of factors in aggravation (*ibid.*); (3) does not require that the jury be instructed that mitigating factors can be considered solely for mitigation (*ibid.*); (4) does not require intercase proportionality review (*People v. Charles* (2015) 61 Cal.4th 308, 337); and (5) provides certain procedural safeguards to noncapital defendants that are not available to capital defendants (*ibid.*).

## H. Denial of Automatic Motion to Modify Death Verdict

Defendant contends the trial court erred when it denied his automatic motion to modify the death verdict (§ 190.4, subd. (e)) because it gave no weight to the mitigating evidence of duress, and it erroneously found that evidence of his mental health problems was not mitigating. He asserts the error violated his federal and state constitutional rights to due process and a reliable penalty determination, and the prohibition against arbitrary and capricious imposition of the death penalty. (U.S. Const., 5th, 8th & 14th Amends.; Cal. Const., art I, §§ 7, subd. (a), 15, 17.) Defendant failed to object to the trial court's ruling and his claim is therefore forfeited. (*People v. Carasi, supra*, 44 Cal.4th at p. 1316.) It is also meritless.

"Every death verdict triggers an automatic application for modification of the sentence. [Citation.] The trial court is obligated to review the evidence, independently reweigh any aggravating and mitigating circumstances, and

91

determine whether the weight of the evidence supports the verdict. [Citations.] In ruling on the application, the trial court must set forth reasons on the record and direct that they be entered in the clerk's minutes. [Citation.] On appeal, we review the trial court's ruling independently, but it is not our role to redetermine the penalty in the first instance." (*People v. Gamache, supra,* 48 Cal.4th at p. 403.) "Where the record shows the trial court properly performed its duty under section 190.4, subdivision (e), to conduct an independent reweighing of the aggravating and mitigating evidence, the court's ruling will be upheld." (*People v. Cunningham* (2015) 61 Cal.4th 609, 669.)

Here, the trial court's written statement of reasons for denying the motion demonstrates it was aware of its obligation to independently consider all the evidence. The court noted, however, that it was not the court's intention to "list every item of evidence . . . , but rather to recite the principal factors, which most powerfully inform and influence the decision at hand." This was proper; the court was not required to "recount 'every detail' supporting its determination." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1064.)

The trial court considered both aggravating and mitigating evidence. With respect to the factors in aggravation, the court found that the murder was willful, deliberate, and premeditated, with express malice aforethought, and was gang related. The court also listed, in some detail, defendant's long and violent history of other criminal activity while incarcerated. The court found there was no evidence to show defendant committed the murder under the influence of extreme mental or emotional disturbance or that he acted under extreme duress or the substantial domination of another. With respect to factors that might extenuate the gravity of the crime (§ 190.3, factor (k)), the court noted defendant's traumatic childhood, physical, mental and sexual abuse, his diagnosis of bipolar disorder, and the failure of prison authorities to consistently provide him with medication.

92

Nonetheless, the court concluded: "While it is easy to feel great sympathy for the defendant as a child, and it appears clear that the defendant should have received better mental health supervision in prison, it also appears that these factors had little to do with his decision to kill."

Although defendant frames his claim as a failure of the trial court to consider his mitigating evidence, his claim, in essence, is that the trial court failed to give sufficient weight to evidence of duress and his mental health issues. His contention does not reflect a valid appellate challenge to the trial court's decision. (See *People v. Abilez* (2007) 41 Cal.4th 472, 530 [The fact that the trial court "did not find defendant's proffered mitigating evidence as persuasive as he would have liked does not undermine" the conclusion that the court properly conducted an independent reweighing of the aggravating and mitigating evidence].) Accordingly, even were the claim not forfeited by defendant's failure to object, we would affirm the trial court's ruling.

### I. International Law

Contrary to defendant's assertion, "California's death penalty law does not violate international law and norms or evolving standards of decency." (*People v. Cage, supra,* 62 Cal.4th at p. 297.)

### J. Disproportionality of the Death Sentence

Defendant contends his death sentence is unconstitutionally disproportionate to the offense and the offender. "[W]hen a defendant requests intracase proportionality review, . . . we review the particular facts of the case to determine whether the death sentence is so disproportionate to the defendant's personal culpability as to violate the California Constitution's prohibition against cruel or unusual punishment." (*People v. Wallace*, *supra*, 44 Cal.4th at p. 1099.)

93

" 'To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.]' [Citation.] 'If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], or, stated another way, that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " [citation], the court must invalidate the sentence as unconstitutional.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1287.)

Defendant's disproportionality argument emphasizes evidence that (1) he was manipulated and ordered to kill Addis, (2) prison authorities failed to provide consistent treatment for his bipolar disorder, and (3) he suffered a traumatic childhood. The only evidence he cites to support his claim of manipulation is expert testimony that he was easily manipulated; there is no evidence he was manipulated in this case. With respect to his claim that he was ordered to kill Addis, the fact that another gang member may have been the shot-caller does not mitigate defendant's culpability in this case. After defendant savagely attacked Addis, defendant lay giggling and laughing on the ground. In a subsequent letter, defendant wrote that the killing "kinda put me at ease, had to earn it," and that committing the murder would elevate his status with higher ranking gang members. Based on this evidence, it appears he was a hit man for the gang rather than a pawn. In support of his theory of manipulation and duress, defendant asserts that prison officials knew Addis would be assaulted if he came into the yard, and he observes that he was not the person who demanded that Addis be

94

brought out, but he does not explain how these facts would diminish his role in the murder.

With respect to treatment for defendant's bipolar disorder, although it is true there was evidence prison officials did not consistently provide defendant with certain psychotropic medications, it is also true, as the People point out, that there was evidence both that defendant denied he had any mental health issues and sometimes refused such medications. Thus, defendant's assertion that his criminal activity in prison merely "resulted from the denial of treatment for long-standing mental health issues" is not persuasive.

Finally, with respect to defendant's traumatic childhood, although his childhood was characterized by abuse and neglect, there was also considerable family support offered to him by his grandparents.

The evidence reflects that defendant, a member of a prison gang, with a long history of violence while incarcerated, committed a vicious, unwarranted, surprise attack on an unarmed fellow inmate, causing his victim to bleed to death. Considered together with defendant's personal circumstances, we cannot conclude that the imposition of the death penalty shocks the conscience or offends fundamental notions of human dignity.

Defendant also invokes sections 1181, subdivision 7, and 1260 as authority for this court to reduce his sentence from death to life imprisonment without the possibility of parole.[21] "But under those sections, 'we lack the power to overturn

---

[21] Section 1181, subdivision 7, states that a court may grant a new trial motion "[w]hen the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed."

*(footnote continued on next page)*

a judgment of death simply because we disagree with the jury's penalty determination' [citation], and we may only reverse the judgment if we find 'prejudicial error or legal insufficiency of evidence [citation].' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1427.) We find neither of those circumstances.

## K. Asserted Cumulative Error

Defendant contends the cumulative weight of asserted errors occurring at his trial requires reversal. We have not affirmatively concluded that any errors occurred, and in those instances in which we have assumed an error, have concluded any error was harmless. Even when considered cumulatively, the assumed errors could not have deprived defendant of a fundamentally fair trial.

## IV. NONCAPITAL SENTENCING CLAIM

Defendant contends the trial court erroneously imposed a one-year sentence enhancement for use of a deadly weapon (former § 12022, subd. (b)(1) (hereinafter section 12022(b)(1)) on count 3, the assault on Joseph Matthews (§ 4500) because use of a deadly weapon was an element of defendant's offense. We agree.[22]

---

*(footnote continued from previous page)*

Section 1260 provides that "[t]he court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

[22] Defendant did not object to the imposition of the enhancement at trial, but argues that the trial court's action constituted an unauthorized sentence that is subject to correction at any time without objection. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1044.) On that basis, we review the claim.

At the time of trial, section 12022(b)(1) stated: "Any person who personally uses a deadly or dangerous weapon in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year, *unless use of a deadly or dangerous weapon is an element of the offense of which he or she was convicted.*" (Italics added.) As a general rule, "[t]he phrase 'element of the offense' signifies an essential component of the legal definition of the crime, considered in the abstract." (*People v. Hansen* (1994) 9 Cal.4th 300, 317, italics omitted, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1199.) In *Hansen*, the defendant was convicted of second degree felony murder, based on the underlying felony of discharging a firearm into an inhabited dwelling. We concluded the firearm use enhancement could be imposed on the defendant's conviction, because the crime of second degree murder, "considered in the abstract, does not include use of a firearm as an element. Second degree murder may be committed in a myriad of ways, some that involve use of a firearm, and others, such as stabbing, poisoning or strangling, that do not involve use of this type of weapon. Under [former] section 12022.5, subdivision (a), the enhancement applies unless 'use of a firearm is an element of the offense,' and not merely the means by which the offense was committed or the factual predicate of a theory upon which the conviction was based." (*Hansen,* at p. 317.)

Defendant acknowledges *Hansen*, but contends the facts of this case come within the reasoning of *People v. McGee* (1993) 15 Cal.App.4th 107 (*McGee*). McGee stabbed his victim with a knife, and was convicted under former section 245, subdivision (a)(1) (section 245(a)(1)), which applied to " 'an assault . . . [1] with a deadly weapon or instrument other than a firearm or [2] by any means of

97

force likely to produce great bodily injury . . . .' " (*McGee*, at p. 112, fn. 2)  The trial court imposed an enhancement under section 12022(b)(1) for use of a deadly weapon, which the Court of Appeal struck.

The appellate court in *McGee* acknowledged that the phrase " 'element of the offense' " in the enhancement statute means " 'an essential component of the legal definition of the crime considered in the abstract.' " (*McGee, supra,* 15 Cal.App.4th at p. 114, italics omitted.)  It also observed that section 245(a)(1) specified two forms of prohibited conduct, assault with a deadly weapon other than a firearm and assault by means of force likely to produce great injury.  Therefore, section 245(a)(1) could be violated without using a deadly weapon.  (*Ibid.*)  The court further observed, however, that the statute " 'defines only one offense, to wit "assault upon the person of another with a deadly weapon or instrument [other than a firearm] or by any means of force likely to produce great bodily injury . . . ."  The offense of assault by means of force likely to produce great bodily injury is not an offense separate from . . . the offense of assault with a deadly weapon.' [Citation.]  Consequently, in determining whether use of a deadly weapon other than a firearm is an element of a section 245, subdivision (a)(1) conviction, the question is not simply whether, in the abstract, the section can be violated without using such a weapon.  Rather, the conduct of the accused, i.e., the means by which he or she violated the statute, must be considered." (*McGee, supra,* 15 Cal.App.4th at pp. 114-115.)

Applying these observations to the facts before it, the court in *McGee* concluded:  "Here, defendant's use of a deadly weapon other than a firearm was the sole means by which he violated section 245, subdivision (a)(1).  The assault by means of force likely to produce great bodily injury was defendant's stabbing of the victim with a knife.  Hence, his use of the weapon was an element of the offense, within the meaning of section 12022, subdivision (b), even though the

98

crime was pleaded as an assault by means of force likely to produce great bodily injury rather than as an assault with a deadly weapon other than a firearm." (*McGee, supra*, 15 Cal.App.4th at p. 115.)  The court also noted that the prosecutor had pleaded the offense as an assault by means of force likely to produce great bodily injury rather than an assault with a deadly weapon to "evade the statute's exception and to increase the punishment imposed on defendant." (*Id*. at p. 116.)  If prosecutors were allowed to "divide section 245, subdivision (a)(1) into two separate offenses regardless of the defendant's conduct, . . . similarly situated defendants who assaulted their victims with deadly weapons other than firearms and were charged with violating section 245, subdivision (a)(1) could receive disparate punishment depending solely upon the language used in the pleadings. . . .  This is an absurd and unjust result which is inconsistent with the legislative intent in enacting sections 245, subdivision (a)(1) and 12022, subdivision (b)." (*Id.* at p. 117.)

Section 4500 is similar to the version of section 245 considered in *McGee, supra*, 5 Cal.App.4th 107, in that section 4500 refers to a person "who, with malice aforethought, commits an assault upon the person of another *with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury*." (Italics added.)  Thus, as was true of former section 245, subdivision (a)(1), section 4500 defines a single offense that can be committed in one of two ways, by use of a deadly weapon or instrument *or* by any means of force likely to produce great bodily injury.  Whether in a particular case, the use of a deadly weapon or instrument was an element of the offense cannot be answered in the abstract; "the conduct of the accused, i.e., the means by which he or she violated the statute, must be considered." (*McGee, supra,* 15 Cal.App.4th at p. 115.)

In this case, not only did the evidence show defendant used a razor to cut a gash in Matthews's back, but with respect to count 3, the jury was specifically

instructed: "In order to prove this crime, each of the following *elements* must be proved: (1) A person was assaulted; [¶] (2) *The assault was committed with a deadly weapon or instrument . . . .*" Thus, in the particular circumstances of this case, the use of a deadly or dangerous weapon was an element of defendant's offense under section 4500, barring imposition of the use enhancement set forth in section 12022 (b)(1).

The People's attempts to distinguish *McGee* are unpersuasive. The People contend that *McGee* contradicts the public policy of punishing more severely those with a greater degree of culpability. The case they cite for this proposition, *People v. Murray* (1994) 23 Cal.App.4th 1783, involved consecutive sentencing for mixed felony and misdemeanor convictions and not the enhancement at issue here; its public policy observation arises in that specific, and distinguishable, context. (*Id.* at pp. 1787-1788.) Moreover, the public policy considerations that underlie section 12022(b) were discussed at length in *McGee*, which examined the Legislature's intent in enacting the enhancement. *McGee* concluded that where " 'the Legislature has fixed the punishment for an assault where a deadly weapon is used, . . . it is not to be supposed that for the same offense without any additional factor existing the added punishment should be imposed.' " (*McGee, supra,* 15 Cal.App.4th at p. 116, quoting *In re Shull* (1944) 23 Cal.2d 745, 751.) This observation applies with equal force to section 4500.

The People also argue that *McGee* has been limited to the specific facts of that case, citing a footnote in *People v. Ross* (1994) 28 Cal.App.4th 1151. In *Ross*, the trial court stayed imposition of a firearm use enhancement (former § 12022.5, subd. (b)), where defendant had been convicted of voluntary manslaughter by shooting the victim. The trial court reasoned that the use of the firearm was identical to the " 'crime itself' " and thus section 654 precluded defendant from being punished twice for the same act. (*Ross*, at p. 1155.) The Court of Appeal

reversed because firearm use was not an element of voluntary manslaughter. In this connection, it distinguished *McGee*, noting that the statute at issue there, assault with a deadly weapon (§ 245(a)(1)), "had two alternative forms, as to one of which weapons use *was* an element," and for that reason "has no application to this case." (*Ross,* at p. 1156, fn. 7.) As noted above, section 4500 is analogous to section 245(a)(1), and, therefore, *McGee's* reasoning is equally applicable.

Accordingly, we strike the enhancement for use of a dangerous or deadly weapon from count 3.

## V. CONCLUSION

The enhancement for use of a dangerous or deadly weapon is stricken from count 3, and the judgment is otherwise affirmed.

CANTIL-SAKAUYE, C. J.


WE CONCUR:

WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

101

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Landry

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S100735
**Date Filed:** December 12, 2016

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Paul M. Bryant, Jr.

_____

**Counsel:**

Donald R. Tickle, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Adrianne Denault, Karl T. Terp and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Donald R. Tickle
140 M Street NE, No. 1240
Washington, DC  20002-3370
(202) 695-9405

Michael T. Murphy
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9211